Roy D. Rylander, Appellee, v. Chicago Short Line Railway Company, Appellant.

Gen. No. 47,387.

First District, Third Division.
June 27, 1958.
Rehearing denied October 23, 1958.
Released for publication October 23, 1958.

30

Stevenson, Conaghan, Velde & Hackbert, of Chicago (Harlan L. Hackbert, of counsel) for appellant.

Louis G. Davidson, of Chicago, for appellee.

JUSTICE BRYANT delivered the opinion of the court.

This is an appeal by the defendant in a common law action to recover damages for personal injuries alleged to have been suffered by the plaintiff due to the alleged negligence of the defendant in delivering for loading and use in interstate commerce a tank car which was in defective and unsafe condition for its intended use, wherein the jury returned a verdict for the plaintiff for $32,500, upon which, after defendant's post-trial motions were denied, judgment was entered.

The plaintiff, Roy D. Rylander, was employed by the Interlake Iron Company on February 19, 1951 as a stillman's helper. His duties consisted of mixing various by-products of tar, hereinafter mentioned, in various tanks and loading these products into tank cars.

The defendant, Chicago Short Line Railway Company, is a common carrier. It has a short mileage in the industrial areas in Chicago and vicinity. Its principal function is to render switching service and to pick up freight cars and deliver them to intermediate carriers for the ultimate purpose of transportation to

the consignees, and to accept cars from intermediate carriers and deliver them to local consignees—principally the Interlake plant and the Youngstown plant. It had no contractual relationship with the plaintiff. It performed common carrier service for the plaintiff's employer, Interlake Iron Company.

The Interlake Iron Company operated a large industrial plant and owned railroad tracks within the plant enclosure used in operating the plant. Interlake had no motive power for railroad movement. The defendant operated a locomotive and hired the crew and moved all of the freight cars within the Interlake plant. The defendant also leased certain tracks from Interlake and owned certain other tracks within Interlake's plant, and owned and operated certain tracks adjacent to the Interlake plant. These tracks were used, in part, for storage, in part for the inspection of cars, and in part for minor repairs found necessary upon inspection. Interlake was not a common carrier. A part of the by-products of the operation of the company were creosote, light oil, heavy oil, carbolic naphthalene and pitch.

Tank cars were usually brought into the Interlake plant in the late afternoon and spotted by the defendant for loading during the night. Tank cars were not owned either by Interlake or the defendant, but were leased by Interlake from the General American Transportation Company, whose business it was to furnish cars, upon lease, to prospective shippers of liquids. The cars were delivered by the defendant Chicago Short Line, as a part of its duty as a common carrier, to the consignor, the Interlake company, for loading. The car involved in the alleged injury to the plaintiff was so delivered and spotted in the late afternoon before the alleged injury occurred. The Chicago Short Line, defendant, in common with most other common carriers, did not own *any* tank cars. In that sense of

33

ownership the defendant did not furnish tank cars to Interlake or to any other users of tank cars.

The defendant as a common carrier maintained a car inspection system under the supervision of a Master Car Builder, who supervised car repairs, safety and car inspectors. There was a car inspector employed all day in the yard at the Interlake plant. He inspected both empty, about to be loaded, and loaded, about to be emptied, cars. The inspector was an employee of the defendant.

When a tank car which had been leased by Interlake was received by the defendant it was set for loading, or in storage. When Interlake needed a tank car it ordered out one of the tank cars which it had leased which was available and the defendant moved that tank car to the loading place. When a tank car is tendered to the defendant by an intermediate carrier, if it complies with certain basic regulations of the Interstate Commerce Commission the defendant may not refuse to accept the car from that carrier. It must accept the car and place it upon the repair tracks if repairs are necessary. If the car has a defective wheel, a cracked side frame, broken couplings or broken driving gear, the defendant would repair it in the shop when it was delivered to it by connecting carriers. The defendant repairs safety appliances, including a defective pin lifter, defective brake shoe and dragging brake beam. If a tank car was leaking, such a car would be stenciled: "Don't reload this car on account of leaking. Return home for repairs," and the defendant would notify the owner of the tank car— that is, the General American Transportation Company, in case of a car owned by it. If there are additional types of repairs necessary, tank cars are returned to the owners for repairs. It is required that a tank car be a good, complete sealed unit. When the defendant inspected cars it looked to see if the tank

34

cars had any conditions which might cause leakage. They walked around the car; they looked underneath it for defects; they could see the condition up on the dome of the car; they could see the lugs from both sides of the end of the car when they are in place holding the top down, but they could not see if they are broken. Car inspectors were required to know the condition of the cover on the dome of the car. They did that by determining if there is spillage, but they inspected from the ground below and did not climb on the top of the car. But in inspecting box cars they climbed upon the top of the cars and looked at the running-boards on the top thereof.

On February 19, 1951 a tank car which for some time had been leased by Interlake from the General American Transportation Company was moved by the defendant and placed in a position for loading. On January 9, 1951 that car had been shipped by Interlake to Texas and had been returned on February 17th. On that day the defendant moved the car on Interlake's property, within the plant where the defendant maintained an inspector. These tracks were the tracks leased by the defendant from Interlake and used for storage. This car, leased to Interlake by the General American Transportation Company, was delivered to the defendant empty and under customary procedure, should have been inspected before it was set for loading.

The car that was spotted for loading was a normal tank car, cylindrical in shape, with a dome on top in the center. The dome had a diameter of about 5 feet and a removable cover in the dome which had a diameter of one and a half to two feet. The top of the cylindrical body of the tank car was about 10½ feet from the ground and the dome extended above that about 3 feet. There was a narrow platform on the side of the dome or shell about 8 inches wide and about 2

feet below the top of the cylindrical body of the tank—this making the platform about 5 feet below the top of the dome. The cover of the dome weighed about 50 or 60 pounds and was secured to the dome by a chain. It had two knobs on top of it about 4 inches high which were used to lift and move it. This top was held in place by lugs placed around the circle of the dome opening which were brought down into slots in the opening and were tightened in place with nuts on the lugs, which, when screwed down, held the cover firmly in the opening on the top of the dome.

Interlake provided a permanent platform structure for the loading of tank cars. It is about 3 feet wide and 6 feet long, with a stairway attached to it, and attached to the permanent platform is a hinged platform or drawbridge, which, when it is lowered out onto the tank car, hits the side of the car about level with the top of the tank cylinder. On February 19th the car was so spotted that the hinged platform, when extended towards the car, was opposite the dome itself.

On February 19, 1951, when the plaintiff came to work, he found a tank car which the defendant had spotted for loading with creosote. He lowered the bridge and went out on the platform. The car was empty. While the cover of the dome was in place, only two or three of the lugs, with the nuts, were in their proper slots and screwed down to hold the cover in place. He used an 18-inch Stillson pipe wrench and loosened the nuts on the lugs which were holding the top in place. After he loosened the nuts he pulled the lugs back out of their slots, removed the cover from the hole in the top of the dome and set it on one side of the dome, where it was held with a chain. The car is loaded with creosote only through the top of the dome. He checked a valve inside of the dome to make sure that it was closed. Then he went back across the bridge to the platform and down the stairs and underneath

the car, where there is a boot cap that fits on a drain leg so that it won't leak any of the solution inside the car. He took off the boot cap to make sure that the valve in the drain leg was closed. He then went up on the drawbridge again and put the spout in the opening ·of the dome. After dropping the nozzle of the pipe into the opening of the dome he steamed the lines to make sure the lines were open from the mixing tank into the car. Then he started to fill the car with a creosote solution which must be loaded at a temperature of 170 degrees Fahrenheit. He wore rubber gloves and heavy work shoes with cork bottoms for this work. When the car was a quarter or half full he went underneath the car again to see that the valve was not leaking and put the boot cap back in place. When the car was full, to within 4 or 5 inches below the top of the cylindrical body, he went to the mixing tank, about 50 feet away, to shut off the valve, and went to the platform where there was a switch to shut off the pump. He then sent steam back through the line so that there would be nothing left in the line to harden. Then he took the spout out of the car. The spout is about 7 feet long, with an elbow, with another pipe about a foot long at the end of the elbow. The pipe is about 6 inches in diameter. Then, following the usual and customary methods, he got upon the top of the dome to put the cover back in place. It weighed 50 to 60 pounds, and it was physically impossible to handle the cover and set it down in place and turn it in position from anywhere except the dome. He got on top of the dome in a squatting position, took hold of the two knobs on the dome and set the top in the proper position and turned it so that the lugs would be opposite the slots in the top. He set the notches on the side of the cover down into the grooves of the top. They went down about half an inch, and then he turned it, and when it got into the last groove it dropped all the way

37

down and stayed in position, and in that position the lugs would fit in their proper slots. He started to put the lugs in place and tighten down the nuts. The first two raised from the side of the car and fitted into place, and the nuts screwed down without trouble. He attempted to put the third lug in place and found that it was covered with creosote and was stuck to the car. That lug had not been used to hold the tank cover in place when it had been delivered as an empty car. He used his wrench on the lug and finally got it loosened from the top of the dome and into place in the slot. Then he took his wrench and tried to turn the nut on this lug in order to hold the top down tight to prevent leakage. He had been previously told that it was necessary to completely tighten the top to prevent leakage. The nut at first refused to move, and then moved very slightly, as the lug was covered with creosote which had been drying about two weeks. It was very hard. He was using a lot of force and straining himself to turn the nut. He was holding onto the round safety valve on top of the car. After he had made one complete turn, the dried tar or creosote began to "really" pack down. He placed his wrench on the nut again and pulled with all his might. The creosote popped right off. Either the nut gave way or the wrench gave. In any event he lost his balance, his holding grip gave way and the next thing he knew he was lying on the ground.

The plaintiff sustained severe and permanent injuries as a result of the fall. The function and use of his left hip joint are greatly impaired and further changes in the head of the femur are taking place so that further surgery will be required on the left hip. He was a patient in the South Chicago Community Hospital from February 20 to June 7, 1951, and in Mercy Hospital from January 2 to March 22, 1952, and

38

in the Veterans Administration Hospital from June 11, 1952 to January 13, 1953.

Defendant states as its first point for the reversal of the judgment of the court below: "The defendant was not guilty of actionable negligence." As stated, the point raises questions both as to what constitutes actionable negligence in the instant case, and as to whether the plaintiff maintained the burden of proof. The complaint in its first paragraph alleged: ". . . defendant placed a certain tank car on the premises of said Interlake Iron Corporation for loading with creosote." In sub-par. (b) of paragraph 5 of the complaint it is alleged that the defendant had "carelessly and negligently furnished a tank car which was not equipped with railings," etc. Sub-pars. (a) and (b) of paragraph 5 were subsequently stricken from the complaint on motion of the plaintiff. The last portion of sub-par. (c) was likewise stricken, so that the case went to the jury on the following charge of negligence:

"(c) Carelessly and negligently permitted and allowed the fastening devices of said cover on said tank car to become and remain in a defective and unsafe condition and encrusted with material so as to require great and unusual effort and exertion to properly fasten said cover."

The defendant first urges, in consideration of the question that it was not guilty of actionable negligence, that the defendant was under no duty to furnish tank cars to shippers over its line and that it did not "furnish" the tank car on which the plaintiff was injured. There is no doubt that in so far as "furnish" means to own and supply, there is no obligation of a railroad to "furnish" a tank car, and, that the obligation of a carrier to receive and carry by suitable means goods which they assume to transport, does not

39

require the carrier to provide facilities for carrying special types of goods, such as liquids in tank cars. Gustafson v. Michigan Cent. R. Co., 296 Ill. 41, 43; United States v. Pennsylvania R. Co., 242 U. S. 208; Chicago, R. I. & P. Ry. Co. v. Lawton Refining Co., 253 Fed. 705.

From the analysis of the pleadings above made, it would appear that if the plaintiff had ever intended to use the word in his complaint of "furnished" in a technical sense—meaning owned and supplied, as a part of the means of transportation, that he had abandoned that intention when he struck, on his own motion, sub-par. (b) of paragraph 5 from the complaint, and instead was relying on his allegation in paragraph 1 that the defendant had placed a certain tank car on the premises of Interlake Iron Corporation for loading with creosote. There is certainly no dispute in the record that the defendant did not own the tank car in question and that it did not supply it, in an ownership sense, to Interlake. It is equally undisputed that the car was owned by the American General Transportation Company; that it was leased by Interlake, and that it was handled by the defendant as a common carrier when it was first delivered to it for the purpose of conveyance to the plant of Interlake and to the loading position within that plant; that it was handled by the defendant as a common carrier at all times it was handled subsequently, including when it was set for loading on the afternoon of February 19th.

██ Defendant urges that the case of Dominices v. Monongahela Connecting R. Co., 328 Pa. 203, 195 Atl. 747, is authority for the proposition that because plaintiff is an employee of Interlake, which was the lessee of the tank car in question, defendant cannot be held liable for the condition of the tank car. It is a case where the facts were somewhat similar, in that

40

the railroad was merely a connecting railroad which furnished transportation within the Jones & Laughlin plant. In that case, however, there was only a movement of a car from one part of the Jones & Laughlin plant to another part of that plant. The plaintiff in that case was injured by virtue of a defective cap in the car and the accident occurred in unloading sulphuric acid from the car. In that case a judgment was reversed because of the defendant railroad's contention that it owed no duty to the plaintiff. The opinion in that case clearly sets forth (195 Atl. at p. 749) the general theory of liability of a railroad, as follows:

"What is the theory upon which liability ordinarily is imposed upon a railroad company if it delivers a defective car to be unloaded? Apparently, the carrier is regarded as representing to the consignee: *'We are supplying this car (either owned by us or temporarily procured from a connecting carrier or from a private owner) and, as such supplier, we have made a reasonable inspection to enable us to assure you that the car is safe for you and your employes to enter for the purpose of removing your merchandise.'* This implied assurance is the more necessary because the consignee himself is not obliged to make an inspection of the car before his employees unload it. Anderson v. Oliver, 138 Pa. 156, 20 A. 981; McMullen v. Carnegie Bros. & Co., 158 Pa. 518, 27 A. 1043, 23 L. R. A. 448; Rehm v. Pennsylvania R. R. Co., 164 Pa. 91, 94, 30 A. 356; McGinley v. Lehigh Coal & Navigation Co., 224 Pa. 408, 73 A. 552; McGinley v. Central R. R. Co. of New Jersey, 235 Pa. 576, 579, 84 A. 579. Thus under usual circumstances, the consignee and his employees are entitled to rely upon the performance by the carrier of the duty of inspection." (Emphasis ours.)

And just as clearly sets forth (on page 749) the particular situation which made that case an exception:

41

"The vital fact in the present case, differentiating it from all these previous ones, is the identity of consignor and consignee. All that defendant here did, or was asked to do, was to haul the tank car from one plant or part of the Jones & Laughlin establishment to another. Jones & Laughlin Corporation not only knew of the defective condition of the car but had actually created it, and defendant delivered it to Jones & Laughlin Corporation as consignee in the same condition in which it had received it from Jones & Laughlin Corporation as consignor. Under such circumstances defendant should not be held liable for failure to have discovered the defect and to have warned the consignee's employees of danger."

It is clear that in the case before us Interlake was not both the consignor and the consignee; that it did not know of the defective condition of the car, nor did it actually create it. The Dominices case is clearly not authority for the proposition that because the car was a leased car there was no liability by the defendant to the employees of Interlake. Defendant also cites Southern Cotton Oil Co. v. Atlantic Coast Line R. Co., 17 F.2d 411. That case is clearly distinguishable from the instant case and is an exception, again, to the general rule. In that case there was a loss of merchandise in transit caused by defects in a car owned by the consignor. It was held that the consignor could not recover from the railroad, but if the loss had been caused by the failure to inspect, or improper handling of the car, then the railroad would be liable. In the case of Vondergoltz v. Oil & Chemical Products, Inc. (Tex. Civ. App.), 280 S.W.2d 774, cited by defendant, there was a hidden defect in a tank car railing caused by corrosion from chemicals carried in the tank car. The court held that the railroad had a duty to inspect a tank car not belonging to the railroad, but held that the evidence was insufficient to show that if the in-

42

spection had been made it would have found the hidden defect that caused the injury. The court also considered special conditions of the Texas law in regard to the type of inspection to be made, which seems comparable to the general rule in regard to the type of inspection made while cars are in transit. This case clearly does not negate the general rule as to the duty of a common carrier who delivers a car for loading to deliver one reasonably safe for its intended use.

The defendant also urges that it was not guilty of actionable negligence because it properly inspected the tank car before returning it to the lessee. In Maher v. Chicago, M. & St. P. Ry. Co., 278 Fed. 431, the general duty of the carrier delivering a car for loading is set forth as follows: "It was defendant's duty to deliver a car that was in a reasonably safe condition to be used for the purpose intended." The nature of that duty and its application to the defendant is further explained in St. Louis-San Francisco Ry. Co. v. Ewan, 26 F.2d 619, 620:

"The liability of the carrier does not arise out of contract but out of a duty imposed by law. Pennsylvania Railroad Co. v. Hummel (C. C. A.) 167 F. 89, 94. That duty extends, not only to the shipper, who has actually entered into contract with the carrier, but to the employee of that shipper, although, of course, there is no contract between employee and the carrier. Waldron v. Director General of Railroads, supra; Pennsylvania Railroad Co. v. Hummel (C. C. A.) 167 F. 89, 94. Nor is the duty restricted to the employees of the shipper having a contract with the carrier. As this court said in Copeland v. Chicago, B. & Q. R. Co., supra, it extends to those 'who are to handle the freight in and out' of the cars. Therefore in this case it extended to the plaintiff, even although the contract with the defendant was not directly with the plaintiff's employer, but with that employer's selling agent,

43

the Mackie-Clemens Company. The employer, the Quality Coal Company, was the shipper, and the cars were furnished by the defendant for its use. The duty of the defendant certainly extended to that company and its employees."

It is equally clear that although Interlake had an obligation to furnish a safe place for the plaintiff to work, still that obligation did not in any way relieve the defendant from its obligation as set forth above. The Ewan case, above cited, discusses the problem as follows (p. 620):

"Defendant's argument that it was the duty of plaintiff's employer to inspect the car in question, and that its failure so to do constituted negligence, need not here be questioned. That negligence was not an intervening cause of plaintiff's injury. It is a carrier's duty to use ordinary care to deliver cars reasonably safe for the use of shippers and their employees while the cars are being loaded or unloaded. Copeland v. Chicago B. & Q. R. Co. (C. C. A.) 293 F. 12, 15. The employer's duty to provide for the employee a safe place in which to work may be added in the circumstances but does not supplant the carrier's duty. 'The carrier cannot impose this duty to furnish cars reasonably safe on the shipper, to its own relief from liability for injuries to an employee of the shipper. If the carrier is negligent in furnishing a defective car to the shipper, and the shipper in turn is negligent in furnishing it to his employee to be loaded, the carrier and the shipper are both liable to the injured employee; for the proximate cause of the injury is the defective car. But as between the carrier and the shipper the liability of the carrier is primary, for the reason that the shipper has a right to assume that cars furnished have been inspected by the carrier and found reasonably safe.' Waldron v. Director General of Railroads (C. C. A.) 266 F. 196, 198."

44

And the entire doctrine is succinctly summarized in Settle v. Baldwin, 355 Mo. 336, 196 S.W.2d 299, 302–303, as follows:

"If Railroad Company's relation to Ice Company were that of common carrier to shipper there could be no question as to Railroad Company's liability to plaintiff for injuries which were a direct result of a negligent failure to furnish a car reasonably safe for plaintiff's use in his employment in loading the car for his employer, the shipper. And if Railroad Company bore the relation of common carrier to plaintiff's employer, a shipper, and was negligent in failing to furnish a reasonably safe car, it would be immaterial that the car furnished was not owned by Railroad Company. It is a common carrier's duty to use ordinary care to deliver cars reasonably safe for the use of shippers and their employees while the cars are being loaded or unloaded. A shipper-employer's duty to provide for the employee a safe place in which to work does not supplant the common carrier's duty. These principles are clearly stated in authorities cited by plaintiff. St. Louis-San Francisco R. C. v. Ewan, 8 Cir., 26 F.2d 619; Markley v. Kansas City Southern R. Co., 338 Mo. 436, 90 S.W.2d 409; Sykes v. St. Louis & S. F. R. Co., 178 Mo. 693, 77 S. W. 723; Hawkins v. Missouri Pac. R. Co., 182 Mo. App. 323, 170 S. W. 459; Vol. 2, Hutchinson on Carriers, sec. 498, p. 543."

It is to be noted that there are two different types of inspections required of a common carrier: (1) when a car is transferred from one carrying line to another. There the inspection involves a determination that the car is in operating condition: that is, that it can be moved along the receiving carrier's line without danger of breakdown or of damage caused by its condition. (2) There is another type of inspection, which relates not to the obligation of another carrier but to a shipper—the consignor or consignee. That inspection re-

45

lates to the condition of the car submitted to the shipper for the purpose of loading or unloading, and that obligation is not contingent upon whether the car is leased, owned by the railroad company or temporarily procured from a connecting carrier, and requires the providing of a reasonably safe place for the man who loads or unloads the car, regardless of by whom he is employed.

It is contended by the defendant that this duty to inspect, so as to provide a safe place for those unloading or loading cars delivered by a common carrier, does not encompass an obligation to inspect the dome, in so far as its fastenings are concerned, because that would require the defendant to make an inspection other than could be made from the ground. There is no evidence that defendant made any inspection of the car involved. There is some testimony submitted by the defendant that the inspection customarily made of tank cars involved going around the car, checking all things that could be reached from the ground, and observing the car and the dome from each end, and that by such inspection they could determine whether the dome had been so severely damaged that it would cause leakage, and it was therefore not incumbent upon them to climb upon the car and inspect the condition of the dome and of the fastenings which would be required to work effectively if the dome was to be sealed, as required for proper protection at the time of the movement of the car. The testimony was limited to what had been the custom by the defendant, itself, over a period of years, but there was no testimony as to what was the customary procedure by other railroads. There is no testimony whatsoever that any inspection was made of this car at any time by the defendant which included the climbing on the car to inspect the condition of the dome and the closing apparatus of the dome. It is well established law that a

custom or usage cannot alter or change the standard of conduct required by law. Worcester v. Pure Torpedo Co., 127 F.2d 945, 947. And in discussing that principle in Carroll v. Magnolia Petroleum Co., 223 F.2d 657, 665, the court said:

"We know of no rule, and have been cited to none, which allows an informal custom to prevail over positive principals of law, and appellees could not escape liability for any negligence which was the proximate cause of appellant's injuries merely because such custom existed."

It appears, therefore, that even if such custom were entirely and completely proved, it could not affect the primary obligation of the carrier to make such inspection as to ensure the delivery to the consignor of a car which would be reasonably safe for the consignor's employees to use for the purpose of loading. It is our opinion that the authorities above cited clearly state the law in regard to what constitutes actionable negligence, and that the facts here were properly submitted to the jury, and that there is sufficient evidence in the record to sustain the verdict on the question of the defendant's negligence.

■ The defendant also urges as another ground for reversal that the plaintiff had failed to prove his own freedom from contributory negligence. The evidence clearly shows that plaintiff at the time of the occurrence was operating directly in the manner in which he had been instructed to operate. It was the customary way of closing a tank car, and it was the way made necessary by the physical fact of the weight of the top (50 or 60 pounds), the location of the lug and the position of the plaintiff and his ability to operate—standing on the so-called running-board near the dome, which would place a man so low that he would have to operate at a level approximately even with his shoulders. It is urged that by the operation

in this manner plaintiff had chosen a hazardous method of doing his work, and Day v. Barber-Colman Co., 10 Ill.App.2d 494, is cited to the point.

In speaking about the choice of hazardous methods being contributory negligence, the court said (p. 513):

"Having available to him a method or way of doing the job, previously tried and known to be safe, by controlling the movements of the incompleted door during installation by a simple 'C' clamp and block (or block and tackle), and having, nevertheless, perhaps from sheer momentary forgetfulness or oversight, chosen at the moment not to follow that method or way, but another way known to involve those possible hazards, he was, we believe, contributorily negligent as a matter of law."

It is evident that that situation is not at all applicable to the facts in our case. In that case the plaintiff did not use the customary tool to check a door. In our case he used the tool that he had been told to use—a Stillson wrench. It is urged on appeal that possibly there was some solvent which would have broken the creosote, or method of applying heat, or some other way rather than the application of physical force by the plaintiff. There is not the slightest evidence in the record that any such method was ever used by anybody under any circumstances. It therefore would be entirely speculative to assume that the plaintiff had an obligation to use some modern scientific method which had never been customarily used in the closing of tanks, and that his choice in the use of the customary method in such a situation could be considered contributory negligence. There was certainly evidence of the absence of contributory negligence of the plaintiff, and it was proper for the court to leave that question to the jury to decide.

██ As an additional ground for reversal the defendant has urged that the plaintiff has failed to prove

that his employer, Interlake, was free from negligence, and that such negligence is a bar to the recovery by plaintiff. The alleged obligation to prove that his employer was without negligence is based upon the theory that that obligation is imposed on the plaintiff when the plaintiff and his employer are subject to the Workmen's Compensation Act and the plaintiff is entitled to recover under that act. The obligations of the employer to the employee under the Workmen's Compensation Act do not rest upon the negligence of the employer, but upon the relationship existing between the employer and the employee. In our case there is no employer-employee relationship between the plaintiff and the defendant. The plaintiff was an employee of Interlake, not of the defendant. The claim of the plaintiff in this case rests upon the alleged negligence of the third party, who is the defendant. It is based upon the allegation that the defendant placed a certain tank car on the premises of the Interlake Iron Corporation for loading with creosote and carelessly and negligently permitted and allowed the fastening devices of the cover on said tank car to become and remain in a defective and unsafe condition and encrusted with material so as to require great and unusual effort and exertion to properly fasten said cover, and that by reason of that negligence the plaintiff was injured. The obligation that the defendant owed the plaintiff was an entirely different obligation than the one which Interlake owed the plaintiff as his employer.

In O'Brien v. Chicago City Ry. Co., 305 Ill. 244, the court pointed out how the Workmen's Compensation Act completely changed the rights and liabilities of the employer and the employee so that the common law action for negligence could no longer be maintained by the employee against his employer, and that the act has no application to the rights and liabilities of

49

third parties except as those liabilities affect the relative rights of the employer and employee between themselves, in the following language:

"From these cases it appears that we have held (1) that the common law right of action of an employee against his employer for negligently injuring him in the course of his employment is abolished; (2) that the common law right of action of an employee against any other person than his employer for negligently injuring him in the course of his employment where such other person is bound by the provisions of the Workmen's Compensation act is abolished; (3) that the common law right of action of an employee against any other person than his employer for negligently injuring him in the course of his employment where such other person is not bound by the provisions of the Workmen's Compensation act is not affected by the act but is preserved in its full extent to the employee; (4) while the right of action against the person negligently causing an injury who is not bound by the provisions of the act is unaffected by it, the employer who is free from negligence is entitled to indemnification from the proceeds of such cause of action for the compensation he is bound to pay, and the cause of action may be prosecuted in the name of either the employer or the employee, but in either case is for the benefit of both, in accordance with their respective rights; (5) that in cases of negligent injury caused by a person not bound by the act, the injured employee is not put to his election between compensation under the statute and damages at common law but may prosecute the common law action and the statutory claim for compensation at the same time."

It points out that section 29 relates to a situation where a third party is liable for the injury to the employee because of its negligence and the employee

50

recovers full damages for his injuries; that "a complete equitable adjustment of the rights of the employer and employee, as between themselves, would require that out of the amount so received the employer, who was guiltless of any wrong, should receive indemnification for the compensation which he had advanced. The purpose of section 29 is to require this indemnification of the employer who has not been negligent, out of the recovery against the third person whose negligence caused the injury." This does not in any way put in issue lack of negligence on the part of the employer as a limitation upon the plaintiff's cause of action or as an additional requirement which the plaintiff has to meet before he can recover from the negligent third party.

Defendant relies primarily upon the decision of O'Brien v. Rautenbush, 10 Ill.2d 167. In that case two co-employees were injured in an automobile accident while about their master's business, covered by workmen's compensation. The passenger-employee also brought suit against the driver-employee. All of the parties to the litigation were under the Workmen's Compensation Act and their legal status with each other had been fixed by that legislation and the surrender of certain mutual rights and obligations to the other party. The court held that an employee could not recover against a co-employee for injuries sustained in an accident because of their joint employment by the employer. The basis of that decision is set out as follows (pages 173–174):

"It has long been held that the regulation of employer-employee relationship is a proper exercise of the police power and will be upheld unless wholly unreasonable and arbitrary in nature. (Grasse v. Dealer's Transport Co. 412 Ill. 179; Casparis Stone Co. v. Industrial Board, 278 Ill. 77; Truax v. Corrigan, 257 U. S. 312, 66 L. Ed. 254.) The primary purpose of the

51

Workmen's Compensation Act is to provide employees a prompt, sure and definite compensation, together with a quick and efficient remedy, for injuries or death suffered by such employees in the course of their employment, (O'Brien v. Chicago City Railway Co. 305 Ill. 244; Raymond v. Industrial Com. 354 Ill. 586,) and to require the cost of such injuries to be borne by the industry itself and not by its individual members. (Lambert v. Industrial Com. 411 Ill. 593; Faber v. Industrial Com. 352 Ill. 115.) It is our opinion that the provision now in question achieves the desired results.

"Under the present act an employee who is injured by a co-worker need no longer overcome the time-honored fellow-servant doctrine nor rely entirely upon the solvency of the tort-feasor, but he is assured of immediate, certain relief without the necessity of costly and tedious litigation. Furthermore, if he is unfortunate enough to *cause* the injury of a coemployee, he need not fear the extreme financial burden which might otherwise be forced upon his shoulders by the employer or injured employee. On the other hand if plaintiff's assertions are correct, an employee who has inadvertently injured a fellow worker would be forced to bear the sole cost of defending and satisfying the common-law action without any part of the cost being passed on to the industry, since the common employer's liability is expressly limited to the compensation award."

It is true, however, that in that case the court used the following language (p. 171):

"Thus, the common-law action is preserved only if the injury was not proximately caused by the employer or his *employees* and created a legal liability for damages upon the part of some person other than the employer. If these conditions precedent are not met, no such remedy exists. (Ketler Co. v. Industrial Com. 392 Ill. 564; Keeran v. Peoria, Bloomington and Cham-

52

paign Traction Co. 277 Ill. 413.) This construction is supported by the fact that if the legislature had intended that the action would be barred only by the negligence of the employer or the injured employee, it would have had no occasion to use the plural form of 'employees.' Clearly, the negligence of the employer and any of his employees would bar such a recovery."

The language is clearly dicta. It was not necessarily involved in the decision of the court. As dicta it clearly does not prevail against the deciding rationale in other cases. The case of Ketler Co. v. Industrial Commission, 392 Ill. 564, upon which the defendant also relies on the question of the contributory negligence of the employer, is clearly distinguishable from the instant case. In that case the decedent was killed by the negligence of a co-employee in the operation of a piledriver by a construction company when engaged in railroad construction work. None of the employees of the railroad company was present at the time of the occurrence. For reasons satisfactory to itself, the railroad made a settlement with the decedent's widow and gave her $4,000. Thereafter the widow filed a claim against her deceased husband's employer, the F. K. Ketler Company, under the Workmen's Compensation Act. An award was given the widow under that act, and the employer wanted to have set off against that award the amount that the widow had received from the railroad company. The Industrial Commission refused to allow that award to be set off, and in passing upon that ruling the court said (p. 571):

"There is no question but that the legislature, in enacting section 29, did so for the purpose of protecting and reimbursing a nonnegligent employer for compensation payments to one of his employees, made necessary by the intervening negligence of a third party. (O'Brien v. Chicago City Railway Co., 305 Ill. 244; Huntoon v. Pritchard, 371 Ill. 36.) Likewise, it

53

is clear that the fact of recovery by way of settlement rather than by judgment will not prevent the operation of section 29 for the benefit of the compensation-paying employer.

". . .

"As above stated, the facts in this case not only show that the accident to Parker was caused by the negligence of an employee of the Ketler company, but also that the employees of the railway company were not even remotely connected with the incident. We have examined all of the cases cited by the petitioner, both in this State and other jurisdictions. In every single instance where the employer was allowed credit, the facts affirmatively show or the opinion assumes that the employer and his employees were free from negligence and that there was negligence on the part of the third party."

It would therefore appear that this case points out that the purpose of the second paragraph of section 29 was not to limit the right of an employee to recover from a third party, but to make it plain that the right of the employer to reduce his liability by the amount received by the employee from the third-party-negligent-person is predicated upon the lack of negligence on the part of the employer.

It is to be noted that the court in the Rautenbush case was construing section 5(b) of the new Workmen's Compensation Act passed in 1957 [Ill. Rev. Stats. 1957, ch. 100, § 138.5(b)], which is practically identical with the second paragraph of section 29 of the previous Workmen's Compensation Act. (Ill. Rev. Stats. chap. 48, par. 166.) It was the first paragraph of that section which the Supreme Court held unconstitutional in the case of Grasse v. Dealer's Transport Co., 412 Ill. 179, and some of the language of that opinion is pertinent in considering the dicta in the

O'Brien v. Rautenbush opinion. In the Grasse case, the court, in upholding the second paragraph of section 29, said (p. 187):

"Where, however, the third party tort-feasor is not bound by the act, the injured employee has a right to the full measure of his common-law damage under the second paragraph of section 29. (O'Brien v. Chicago City Railway Co. 305 Ill. 244; City of Chicago v. Pizel, 315 Ill. App. 216.) The employer of the injured employee is granted a lien under this provision of the statute on the amount recovered by the employee, to the extent of the compensation paid, and may institute proceedings against the third party tort-feasor, for the benefit of both himself and the employee (Gones v. Fisher, 286 Ill. 606; O'Brien v. Chicago City Railway Co. 305 Ill. 244,) if the latter fails to do so within a specified time."

And again on pages 190–191 the court said:

"As hereinbefore noted, the constitutionality of the Illinois Workmen's Compensation Act, as well as those of other states, has been sustained as a valid exercise of this police power. (New York Central Railroad Co. v. White, 243 U. S. 188.) However, it is evident that the primary purpose of the Workmen's Compensation Act is to afford employees and their dependents a measure of financial protection, (Baker & Conrad, Inc. v. Chicago Heights Construction Co. 364 Ill. 386, 393,) and that a major portion of the statute pertains, not to tort liability, but to a system for imposing liability without fault upon employers for the benefit of their own employees. The basis upon which the validity of such legislation was sustained was as a regulation of the master-servant relation. Inasmuch as the general public had an interest in the loss of life and disability incurred in the course of a hazardous employment, this system of liability and compensation

55

between employers and their own employees injured in the course of their employment was deemed to be a reasonable exercise of the police power.

"Section 29, however, does not purport to regulate the relationship between employers and employees, which are a recognized class for special legislation, but modifies, and even eliminates under some circumstances, the tort liability of third parties who negligently injure employees engaged in another enterprise. It is evident, therefore, that the basis and justification for sustaining the exercise of the police power for the major portion of the Workmen's Compensation Act does not apply to section 29, which treats of a different situation, and regulates tort liability between persons who have no employment or other relationship."

In holding the first paragraph of section 29 void the court, on page 201, said:

"The issue before the court herein is whether the first paragraph of section 29, which deprives an employee under the act, injured in the course of his employment by a third party tort-feasor compulsorily bound by the act, of a common-law action for damages against such tort-feasor, and transfers the employee's cause of action to his employer, effects arbitrary classifications in violation of the Federal and Illinois constitutions. We have found that this provision offends the aforementioned constitutional doctrines.

"The effect of our determination is to render the provision void, and to relegate the parties to such rights as they may have had prior to the enactment of the unconstitutional provision. (People v. Schraeberg, 347 Ill. 392.) Under those circumstances, the rights of the parties would be governed by common-law subrogation principles, and the non-negligent employer who had paid compensation would be entitled to be subrogated to the rights of the employee against the

56

third party tort-feasors. The employee, in turn, would not be entitled, as defendant suggests, to retain both compensation from his employer and damages against the third party, but would, under common-law principles, be required to reimburse his employer for the amount paid him from the sum recovered from the third party. Where, however, the third party tort-feasor is not bound by the act, the employer's subrogation rights would still be governed by the second paragraph of section 29, which has not been modified by our decision."

The court found that the first paragraph of section 29 was unconstitutional because it deprived an employee under the act, injured in the course of his employment by a third party tort-feasor, of a common law action for damages against such tort-feasor and transferred the employee's cause of action to his employer. When this language is considered with the decisive language in the O'Brien v. Rautenbush case, and the dicta language therein, it is seen that it was not the intention of the legislature to modify "and even eliminate under some circumstances, the tort liability of third parties who negligently injure employees engaged in another enterprise." (Grasse case 190–191 supra.) Therefore, it cannot be said that it was the intention of the legislature, and that it would be constitutional if it were the legislature's intention, to so limit the rights of every employee to recover for injuries which he received, caused by negligence of an entirely independent third party, such as we have here, by requiring him to prove not only that he was not negligent, but also that his employer was not negligent. If there was an obligation to prove that his employer was not negligent, it would be an added obligation to his common law right to seek redress for the negligence from third parties for their negligence. This could not be accomplished by an act regulating the rights of employers

and employees with each other and among themselves, nor its constitutionality justified by the same rationale. It seems quite clear that the rights which the employer has against the employee to share in his recovery is the action where the employer's lack of negligence is involved, and that it is not involved in the employee's right against a negligent third party. This later cause of action does not rest on the employer-employee relationship, but exists outside its scope, antedates the Workmen's Compensation Act and is not covered by the mutual surrender of rights and remedies which is its constitutional basis. To hold otherwise would place an additional obligation on any plaintiff in an action against a third party simply because in his employment he was covered by workmen's compensation, and thus be in derogation of his common law rights to recover from persons other than his employer or co-employees for any injuries received because of their negligence, if he himself is not negligent. It would seem that by the reasoning of the Grasse case such an interpretation would render the provision invalid. We therefore do not believe that the law required the plaintiff to show that Interlake was not guilty of negligence before he could recover from the defendant, and it is not necessary for us to consider whether the record indicates there was any such negligence on Interlake's part or not.

The defendant also urged that the court erred in admitting evidence of medical expense by refusing to allow inquiry as to by whom the bills were paid and for admitting in evidence certain bills which had not yet been paid, including the Veterans Administration hospital bill at Hines, where it was testified its collection was contingent upon the successful outcome of the law suit. In King v. Meeker, 269 Ill. App. 57, 60, the court said: "Appellants tried to show on cross-examination of appellee that he had not paid his doctor

and hospital bills and that those bills were paid by some other person or corporation. The objections to that line of examination were properly sustained." And in Wicks v. Cuneo-Henneberry Co., 319 Ill. 344, 349, the court said: "The law is settled in this State that in order to recover for medical and surgical services it is necessary that two things be proven: First, that the claimant has paid or become liable to pay a specific amount; and second, that the charges made were reasonable charges for services of that nature." The testimony in regard to the Veterans hospital bill was that the services were for a definite amount and that they were the usual and customary charges for the services by the Veterans hospital for patients who were able to pay for such service. We believe there was no error in the court's ruling in regard to the admissibility of the evidence relating to the medical and hospital expenses.

█ The defendant also claimed error in regard to the court's action in giving instructions P–3 and P–15, and in refusing to give D–7, D–4 and D–15. We have considered all of those instructions and believe that in view of what we have said in regard to the law it is clear that the instructions objected to which were given were correctly given and that the instructions which were tendered and refused were correctly refused. In addition, we have considered the instructions as a whole, and it is our opinion that the instructions given, taken as a whole, substantially and fairly presented the law of the case to the jury and that there was no prejudice in either giving or refusing instructions. Ritzman v. People, 110 Ill. 362.

█ The defendant has also objected to the remarks made by the court to the jury at the time he delivered the verdicts to them. The objection was based on the language which the court used in telling the jury: "In other words, all twelve jurors must agree

59

on one verdict or the other. You will sign only one verdict, either guilty or not guilty, and if guilty you will sign a verdict as to the amount," upon the basis that that language compelled the jurors to agree. Immediately preceding that the court had said: "If that is your verdict, the foreman will sign that verdict first, and all other eleven jurors, if you agree, must sign the same verdict." We cannot think that there was any error which would prejudice the defendant or in the least degree compel any juror to think that he did not have the right to disagree.

The evidence in this case is sufficient to sustain the verdict of the jury on all questions of fact properly before the jury, and the jury was properly instructed in regard to the law. Therefore, the judgment of the trial court will be affirmed.

Affirmed.

FRIEND, P. J. and BURKE, J., concur.