Leo William Conway, Plaintiff-Appellee, v. The Belt Railway Company of Chicago, Defendant-Third Party Plaintiff-Appellant, v. Greenwood Lumber, Inc., Third Party Defendant-Appellee.

Gen. No. 50,367.

First District, Fourth Division.

September 22, 1967.

Rehearing denied October 25, 1967.

Richard F. Koproske and Glen H. Carrier, of Chicago (Glen H. Carrier, of counsel), for appellant.

Ernst Liebman and Charles Pressman, of Pressman & Hartunian, and Berchem, Schwantes & Thuma, of Chicago (Michael J. Thuma, of counsel), for appellees.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Defendant Belt Railway appeals from a jury verdict and judgment for the plaintiff in an action for injuries sustained on August 12, 1958, while unloading beams from a gondola car delivered to plaintiff's employer, Greenwood Lumber, Inc., by The Belt Railway Company. There were six beams, each 49 feet in length, 9 inches wide and "V" shaped at the middle, packaged in two bundles, three beams to a bundle. Each bundle weighed about 8,780 pounds and was loaded with the "V" resting on the flooring of the car, with each end about 4 feet from the floor. Vertical timbers, or "stakes," had been

placed around the sides of the car and between the two bundles to keep the beams from touching the sides and each other. At each end of the gondola car a "six-by-eight" timber was bolted to and lay across the top and width of the car under the protruding ends of the beams, thus forming a cradle which held the ends of the beams off the floor and kept them from tipping forward or backward.

On August 7, 1958, the six beams, weighing a total of 17,560 pounds, had been loaded by Super Structures, Inc., in Albert Lea, Minnesota, into gondola car No. 2715 of the Chicago, Rock Island and Pacific Railroad Company for ultimate delivery to the King Building Supply Company in Chicago, Illinois. The car was made of steel, with a length of about 65 feet and sides approximately 3½ to 4 feet high. The Rock Island Railroad transported the beams to Chicago, where the car was turned over to the Belt Railway for delivery to Greenwood Lumber, Inc. The Belt Railway is owned by some twelve other railroads and serves as an interchange railroad in and around Chicago, taking railway cars delivered to it by one railroad and redelivering the cars to industries or to other railroads for further transportation.

When the car was turned over to Belt by the Rock Island, two inspectors of Belt inspected the car at some time between 1:00 and 2:00 a. m. on August 10, 1958, and found nothing wrong with the car or its load. On August 11, 1958, the car, with its load of beams, was pushed by a locomotive off the main Belt line down a slight grade onto the single east-west track in the Greenwood yard. Mr. Bournazos, the president of Greenwood, saw that damage had occurred to the load, and notified Belt to send an inspector. Mr. Rodeck, of Belt, went to the Greenwood premises to inspect the load and found that a cradle, used to support the beams in the west end of the car, had broken, that the southern bundle

136

had shifted to the west at least two feet and was tilted to one side so it was lying against the northern bundle. He also determined that some damage had occurred, but could not assess the full extent with the bundles still in the car.

At trial, Rodeck testified as to the customary procedures of Belt and to his actions on August 11. (Since plaintiff and defendant both consider Rodeck's testimony to have great bearing on this appeal but differ as to the interpretation this court should adopt, we must examine the testimony in some detail.) Inspectors for Belt inspect each car as Belt takes delivery. They check for damage to the car and also to see whether the lading may have shifted or otherwise become unsafe. As we read the record, Rodeck meant that this safety element applies to further switching operations of Belt and has no application to whether or not the lading would be unsafe for unloading purposes. When asked specifically, "What was the purpose of determing whether or not a load had shifted?" Rodeck answered:

> Well, it would be for our protection more than anything else, because if the load is shifted, there's in all probability damage to that load, not only damage, but there is a possibility that *in the process of switching*, this load could become undone from the car and somebody could get hurt. (Emphasis supplied.)

Continuing, it is customary for a car inspector, on finding an unsafe condition, to attach a green tag, approximately 3x8 inches, indicating, "the initial, the number, and the time the car was mail-ordered, the road we received the car from, the track it came in on, what yard it was received in, and who the inspector was that made the inspection." He found car No. 2715 and its lading too in "bad order condition," but did not affix a green

137

bad-order tag even though he had some tags in his automobile a short distance away. Rodeck said the car was unsafe to move because the lading had shifted. As to why he did not "green tag" it, there is no direct testimony, but he did testify that the usual procedure was to inspect cars in the Belt yards and to green tag them at that time. There was no testimony that an inspection made on premises of a consignee ever required a green tag, and, consistent with our interpretation of the purpose of such a tag, there would seem to be no need to tag a car as unsafe for further switching because of shifted lading once that car has been delivered to the place where the lading is to be removed.

A second type of form, a "bad-order form," MCB–40, was generally completed when a car was received in bad condition. This form would show damage to a car and was for the internal use of the railroad to indicate "what is to be done with or to the car." Rodeck did not fill out one of these, but it is not contended that he found damages or defects in the car itself. Rodeck did complete a "The Belt Railway Company of Chicago Inspector's Report of Loss of Damaged Freight," which briefly described the visible damage, and noted that, "Due to the fact the car was not unloaded the full extent of damage could not be determined . . . . Mr. Finnegan—Claim agent—notified." Rodeck then left the Greenwood premises. According to his testimony, he "did not instruct [the Greenwood people] how to unload [the car, nor did he] offer to have the railroad unload it."

Bournazos testified that he proceeded to unload the car on Rodeck's "go-ahead" sign in order to determine the full extent of the damage. There was evidence that King Building Supply Co., the ultimate receiver of the beams, was in a hurry to get their order from Greenwood. There was no evidence that Greenwood rejected the load or did anything to indicate more than the fact

138

that they might file a claim for damages incurred through the shifting of the lading while in transit. On cross-examination, Bournazos testified that the purpose of Rodeck's inspection was only to establish damage to the beams (King Building Supply did subsequently make a claim), and that King was the company for whom the beams were being unloaded, since the job of Greenwood was to receive, unload, and take the beams to a work site.

On August 12, 1966, Mr. Bournazos and two of Greenwood's employees, Nicholson and plaintiff Conway, proceeded to unload the car. They chained the west end of the south beam to the side of the car as a precautionary measure, but left the east end of the beam free. Using a chain hoist and a forklift truck, they raised the north beam to about four feet from the floor of the car, the greatest height their equipment would permit, a preparatory to swinging the north beam out over the side of the car and then to the ground. At this point, Bournazos was operating the forklift truck and Nicholson the overhead electric hoist. Before the beam could be swung clear of the car, a four-by-four stake had to be removed from the north side near the east end of the car where it had been attached as one of several protecting stakes used to keep the beams from the sides of the car during transit. The top of the stake projected above the side of the car and its height exceeded the lifting capacity of the equipment. Plaintiff argues that the north beam had to be lifted before the stake could be removed. Defendant maintains that Greenwood forgot to remove the stake and did so after the lifting of the north beam and at great peril to plaintiff, and that therefore the employer's negligence was the chargeable cause of plaintiff's injuries.

Plaintiff left the car from the west end during the raising of the north beam. He then reentered the car at

the west end, walked the length of the car under the raised beams to a point near the east end where the stake was attached. With the aid of a pair of pliers, he removed some wire from the stake, tossed it to the ground and turned to leave the car from the east end when he saw the east end (the end that had been left unchained) of the south bundle slowly moving toward him. It was then only a few inches away and he vainly put out his hands to stop it but the beams pinned him against the side of the car. He was squeezed until he turned blue and after Bournazos and Nicholson managed to place supports under the north bundle and employ the forklift to free Conway from the south beams, they gave him artificial respiration and revived him from unconsciousness. Plaintiff was severely injured as a result of the accident.

Defendant's first major contention is that while this precise factual situation is one of first impression in Illinois, under established general rules a delivering carrier owes to the consignee and his employees no more than the duty to reasonably inspect the car and lading and then to either repair or warn the consignee of any conditions which render it unsafe for unloading. In this case, defendant argues, the consignee and his employees were experienced in unloading freight cars, saw the damaged condition of the lading yet accepted delivery and commenced to unload, and, therefore, defendant owed no further duty to the plaintiff upon which an award for negligence may properly be founded. Plaintiff argues that the carrier's duty to provide the consignee and his employees with a safe place to work includes the unloading of damaged lading and does not terminate when the employee has notice of the existence of a defect; that therefore the jury properly found the negligence of Belt to be the proximate cause of plaintiff's injuries.

■ ■ We find the duty of the delivering carrier, defendant in this case, not to encompass the unloading

140

process whereby plaintiff was injured, since the injury was not occasioned by any defect, latent or otherwise, in the car itself, but, rather, by a damaged condition in the lading of which plaintiff and his employer were fully cognizant when they nevertheless undertook to remove the shifted bundles from the car. A carrier owes his consignee the duty to inspect so as to provide a car reasonably safe for the purpose for which it is intended. Maher v. Chicago, M. & St. P. Ry. Co., 278 F 431, 434–435 (7th Cir, 1921); Erie R. Co. v. Murphy, 108 F2d 817 (6th Cir, 1940); Wintersteen v. National Cooperage & Woodenware Co., 361 Ill 95, 197 NE 578; Rylander v. Chicago Short Line Ry. Co., 17 Ill2d 618, 161 NE2d 812, affirming 19 Ill App2d 29, 153 NE2d 225.[1] However, this duty does not cause the carrier to be an insurer of possible injuries proximately caused by the unloading of damaged lading where any such defects are visible and unrelated to the condition of the car itself.

In Rylander v. Chicago Short Line Ry. Co., 17 Ill2d 618, 161 NE2d 812, a carrier was held liable to an employee of the consignee for injuries sustained due to a fall from the top of a railroad "tank" car while it was being unloaded. A bolt on top of the car, which the carrier had delivered, was coated in creosote and broke when the employee tried to tighten it, thus causing his fall. The duty which the carrier was held to have breached was that of reasonably inspecting the car to discover such defects. Contrary to plaintiff's contention, Rylander does not, therefore, establish an additional responsibility on the part of the carrier during the unloading process. Because a carrier must provide a safe car

[1] See also Oklahoma City-Ada-Atoka Ry. Co. v. Crabtree, 207 Okla 327, 249 P2d 445, 446–448; Bachmann v. Chicago, M., St. P. & P. R. Co., 266 Wis 466, 63 NW2d 824, 827; Missouri Pac. R. Co. v. Carey, 138 Ark 563, 212 SW 80, 81–82; Oklahoma City-Ada-Atoka Ry. Co. v. Riddle, 183 Okla 318, 82 P2d 304.

from which to unload, does not mean the carrier must also assume responsibility for the unloading of obviously shifted and damaged lading.

The defendant here did not fail to make a proper inspection. When Belt took delivery, there was no damage found to either car or lading. Consequently, the car was not tagged as unsafe for further switching. After delivery to the consignee, damage was reported and Belt then made another inspection, this report showing damage to the lading as a result of its having shifted at some undetermined time. As noted above, we do not see why there was any need for Rodeck to tag the car at that point, as further transit was not contemplated and there was no damage to the car itself. From the testimony of Rodeck, plaintiff infers that defendant still considered the car and lading as its responsibility and that plaintiff unloaded the beams at defendant's request for the purpose of assisting defendant in making a complete inspection of the damaged lading. We do not so read the testimony. There is no evidence that defendant, through Rodeck, ever assumed responsibility for the unloading or offered any advice to the consignee as to whether or how the process should be performed. In fact, Rodeck categorically denied any such inference, and the mere fact that he gave Bournazos his "go ahead" cannot properly support a conclusion to the contrary. It is unreasonable to impart more to Rodeck's "go ahead" than that as far as Belt was concerned, the consignee could do with the load as they wished without jeopardizing any future claims for damage to the beams since Belt knew from the observation of its inspector that damage had occurred for which claim might be made against it.

Since defendant discharged the duty of inspection found in Rylander and did not voluntarily assume responsibility for unloading, to support the award of damages

to plaintiff there must have been a breach by defendant of some other legal duty which proximately contributed to plaintiff's injuries.

In Shipley v. Southern Pac. Co., 44 Ill App2d 1, 193 NE 2d 862, we held that a carrier which did not load some plywood, which shifted during transit and during the unloading of which the consignee's employee was injured, owed no legal duty to inspect the condition of the lading to determine whether it was safe for unloading, since the carrier only received the sealed car and delivered it. In answer to the contention (based on Rylander and similar cases), "that defendant . . . is liable for failing to deliver the car in a reasonably safe condition for unloading," we specifically distinguished those authorities on the same grounds pertinent here: "These cases involve the duty of the carrier to inspect and discover a defect in the car itself." (44 Ill App2d at 4.) In Rollins v. General American Transp. Corp., 46 Ill App2d 266, 269, 197 NE2d 68, Shipley was cited for the following proposition:

> At the time of unloading there was no control, supervision, or direction by any of the defendants. Since (plaintiff's employer) was lessee, consignor, consignee, there was no duty on the part of (defendant) as to unloading.

Factually, Shipley and the cases relied upon therein,[2] are distinguishable in that the carriers there only

---

[2] Rocco v. New York Cent. System, 7 Misc2d 286, 166 NYS2d 371; Lewis v. New York, O. & W. Ry. Co., 210 NY 429, 104 NE 944; Seeden v. Great Northern R. Co., 242 Minn 360, 65 NW2d 178; Butler v. Norfolk Southern Ry. Co., 140 F Supp 601 (DC NC, 1956); Reed v. Missouri-Kansas-Texas R. Co., 362 Mo 1, 239 SW2d 328, 332. (Actually, in Reed, the injury resulted from supporting stakes on a flatcar inadequate to prevent a load of power-line poles from falling on plaintiff. The court found the

received and delivered sealed freight cars, whereas here the gondola car was not sealed. Irrespective of this variation in fact, we feel the principle of law should be the same in both situations. The carrier's responsibility should be no greater simply because it has access to the lading in an open car. As noted, the lading was inspected with the car at the Belt yards and at the Greenwood premises to determine whether the car was thereby rendered unsafe for further transit. That a carrier may be liable for cargo damage is not determinative of whether it is also responsible for injuries sustained during the unloading of that cargo where such injuries are not attributable to any defect in the car supplied by the carrier.

The factual situation here is even more compelling toward nonliability of the carrier than in Shipley where the car was sealed, since here the fact that the lading had shifted was obvious and apparent:

> "We are aware of no valid reason for holding that a carrier is under a duty to give notice or warning of a condition which is so visible that any danger therefrom must be apparent to and appreciated by a person of ordinary intelligence, prudence, and experience who undertakes the unloading of a car." (Nashville Bridge Co. v. Ritch, 276 F2d 171, 179 (5th Cir, 1960) quoting from Southern Ry. Co. v. Edwards, 44 F2d 526 (5th Cir, 1930).)

See also United States Steel Corp. v. McCraney, 257 F 2d 457 (5th Cir, 1958).

 We do not decide whether plaintiff's injuries were caused by his own negligence, or by his employer, the consignee, or whether there was any negligence at

---

stakes to have been placed by the shipper who did the loading and that they did not constitute a defect in the railroad equipment for which the carrier would have otherwise been responsible.)

144

all. We do not find that there is no breach of any legal duty by a carrier, upon which liability may be founded, when injuries occur in the process of unloading damaged lading, in the absence of proof of a defect in the car itself which caused or contributed to the injuries, where the damaged condition of the lading is known to the consignee, where the consignee is shown to be experienced in unloading, and where the carrier has not voluntarily assumed any responsibility for the unloading.

Other points raised on this appeal are not considered, as they are not essential to our decision.

The judgment of the Circuit Court is reversed, with judgment here in favor of defendant, The Belt Railway Company of Chicago.

Reversed.

DRUCKER and McCORMICK, JJ., concur.