Willie **PELLEGRINI,** Plaintiff-Appellant,

v.

**CHICAGO GREAT WESTERN RAIL-
WAY COMPANY,** a corporation,
Defendant-Appellee.

No. 13922.

United States Court of Appeals
Seventh Circuit.

June 4, 1963.

On Petition for Modification
July 30, 1963.

Rehearing Denied July 30, 1963.

James A. Dooley, Chicago, Ill., for appellant.

R. Lawrence Storms, Edward J. Wendrow, Chicago, Ill., Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel, for appellee.

Before DUFFY, SWYGERT and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

Plaintiff, Willie Pellegrini, brought this common law action against defendant, Chicago Great Western Railway Company, to recover damages for personal injuries allegedly sustained by him as the result of defendant's negligence in delivering for loading and use in interstate commerce a railroad boxcar (owned by the Pennsylvania Railroad Company) which was in a defective and unsafe condition for its intended use. The alleged injury was sustained March 16, 1958, when the door of the car fell off and struck plaintiff as he was performing his duties as grain inspector for the State of Illinois. Defendant denied negligence and also pleaded contributory negligence on plaintiff's part. The case was tried to a jury which returned a verdict in favor of defendant and against plaintiff. From a judgment entered on this verdict, plaintiff appeals.

The contested issues here as stated by plaintiff are (1) that the trial court erred in its refusal at the close of all the evidence to direct a verdict that defendant, as a matter of law, was guilty of negligence, and (2) that plaintiff was denied a fair and impartial trial by the admission of incompetent and prejudicial evidence, by the refusal to admit competent evidence and by the giving to the jury of improper and erroneous instructions.

The contested issues as stated by defendant (in summary form) are (1) that the court could properly have directed a verdict for defendant on the ground that plaintiff failed to prove the negligence alleged; (2) that plaintiff was guilty of contributory negligence which would bar recovery as a matter of law; (3) that if it be assumed, contrary to defendant's contention, that plaintiff made a submissible jury case on the question of defendant's negligence and his freedom from contributory negligence, no reversible error was committed during the course of the trial. Particularly it is contended that any rulings on the admission of evidence or the giving of instructions relating to damages were necessarily harmless in view of the fact that the jury returned a verdict of no liability.

We consider first the issues relating to liability, which encompass questions of law and fact. The principal question of law concerns the duty of a railroad when it furnishes a car to a shipper and its employees to be loaded or unloaded. The issue of fact, perhaps also one of law, arises from the court's refusal to direct a verdict pursuant to motions made by each of the parties. More specifically, it relates to the action of the court in submitting the case to the jury.

The trial was lengthy and the trial court was presented with many complicated and difficult situations. This court waived on behalf of plaintiff the filing of a printed appendix and consented to hear the appeal on the transcript of the proceedings, which exceeds 3500 pages, with

a common law record of 380 pages. Our burden, however, has been eased to some extent by the defendant's submission of a printed appendix in connection with its brief. After much consideration, we have reached the definite conclusion that neither side was entitled to a directed verdict and that the court properly submitted the case to the jury. Even so, we think, contrary to the vigorous contention advanced by each of the parties, that the case on its facts is close; in fact, it is one of those cases where the record would support a jury verdict either for or against defendant. It follows that the verdict must prevail, providing the case was tried free from prejudicial error.

A detailed statement of the proof would unduly prolong this opinion and is unnecessary in view of the conclusion above stated. We shall, therefore, attempt to state the facts in abbreviated fashion. The car in controversy, owned by the Pennsylvania Railroad, was loaded at West Lafayette, Ohio, with 860 milk cans, consigned to Sumner, Iowa. On March 4, 1958, it was delivered to defendant in Chicago, moved by it to Oelwein, Iowa, where it was moved by another train to Sumner, Iowa, and unloaded March 7, 1958. It was then moved empty to Westgate, Iowa, where, on March 12, it was loaded with corn by Westgate Elevator Company. The car was sealed and left Westgate March 14, destined for Chicago, where it arrived March 15. It was on the following day that the occurrence giving rise to this law suit took place.

The car was continuously under seal during the time it was in defendant's possession, except the time between the date it was unloaded at Sumner and reloaded at Westgate. Defendant maintained no car inspector in either of these towns, and made no inspection of the car while it was in its possession other than the so-called running, external inspection which consisted of inspecting the outside of the car and such appurtenances as brakes, wheels and rigging.

Plaintiff was a member of a crew of grain inspectors some of whom, including plaintiff, were employed by the State, some by the Chicago Board of Trade and one by the defendant. All grain cars coming to Chicago's yard were subject to grain inspection by this crew. The crew was thus engaged on the morning of March 16, 1958. To make an inspection, the seal on the door was broken, the door latch released, the car door opened and a probe to pick up and withdraw grain samples was then inserted in the load of grain. Plaintiff's particular duty was to open the car door so the samplers could do their work and for this purpose was furnished a 3½ ft. crowbar, the tool customarily and usually used for opening car doors. The car in controversy was steel, approximately 40-ft. long, with openings on either side covered by steel sliding doors weighing approximately 250 pounds, and had a grain capacity of 80 to 100 thousand pounds.

Grain cars, including the one in controversy, are lined with wood, the lining being attached to vertical wooden door posts on both sides of the car door. These wooden posts are attached to a metal angle riveted to the side of the car. When grain is shipped there is first installed on the inside of each opening what is termed a paper grain door which consists of layers of heavy paper with horizontal bands of steel prefabricated into them, furnished by the defendant to its grain shippers and installed by the latter in the cars, a new paper door being used in each instance. Defendant also supplies the shipper with the means to attach such paper doors to the vertical wooden door posts. When the car is loaded, the grain exerts pressure on the paper doors which in turn exert pressure on the door posts to which they are attached. There is always some bulging of the paper door, the condition of the door posts being the most determinative factor in how much bulging will occur, and normally the paper door will not bulge so much that it will contact the exterior door of the grain car or prevent its closing.

The procedure thus outlined was followed in the instant situation. The car, as noted, was loaded with grain at Westgate, Iowa, by Westgate Elevator, the shipper. The manager of the elevator testified that his company did not inspect cars, but cleaned them out, repaired any holes to prevent leakage of grain, and refused and notified the depot agent of any car found unsuitable for loading. He further testified that he had not seen and could not recall this particular car and that his elevator kept no record on cars found to be defective.

On the morning of March 16, 1958, plaintiff, two other members of a crew of grain inspectors, two employees of the Board of Trade and one employee of defendant were engaged in taking grain samples from railroad cars located in defendant's Chicago yards. All of these persons were at or near the car which plaintiff was attempting to open at the time he received his alleged injuries and all were witnesses for one side or the other. As might be expected, there is some conflict in their testimony as to exactly what happened. It is undisputed that plaintiff first attempted to open the door on the north side of the car and, being unable to do so, made the same attempt on the door on the south side. There was testimony that plaintiff broke the seal on the door, reached up with his crowbar to open the latch which was wedged tight and, as he did so, the steel door "popped" off the car and struck him; that he was knocked down, attempted to get up but couldn't. There was testimony that the door was bulged and "swelled out," indicating that the paper door was exerting pressure against the steel door, which kept the latter from opening. After the occurrence, members of the grain crew examined the car and the door. There was testimony that the paper grain door had pulled loose from the posts to which it was attached and that the door posts were "splintered up and rotten."

On the day following the occurrence, an employee of the defendant, at the request of its general claim agent, inspected the car, and the report made by him, introduced into evidence by plaintiff, was as follows:

"This inspection was made by me on March 18, and found the following: AL doorpost broken out, and B. L. doorpost broken and loose. Defects appeared old. Signode paper grain door was bulged out about 5 inches and coming in contact with door which was bent. Both rails where door travels appeared O.K. Marks were found on bottom door supporting paper frame door, indicating bar had been used on door in an effort to open it."

The same person who made this report, testifying as a witness for defendant, stated that the door posts were O.K. but that the metal angle irons in which the wooden door posts were set were broken and loose. He admitted that the paper grain door was bulged out approximately 5" straight down the center, that marks on the bulging part showed that it had been in contact with the outer door and that the latter was bulged outward at the center. He stated that a crew of the defendant had difficulty closing the door after it had been replaced, because of the bulge in the paper door. He stated that he placed a "bad order" ticket on the car, indicating that it should be moved to a repair track for repairs. This witness admitted in a pre-trial deposition that the door posts were the "main support" for a heavy load, and that the "door post was loose from the side sill and your filler was kind of pulled away from the door." He also testified that the defects which he found in the door posts had nothing to do with the door coming off which, in his opinion, was caused by the manner in which it was attempted to be opened. There was also testimony to the effect that bulging of paper grain doors was a common occurrence.

With this sketchy statement of the facts bearing upon the issue of liability, we now turn to a consideration of the duty which defendant owed plaintiff. (Defendant concedes on brief that it

owed the same duty to plaintiff as it did to an employee of the shipper.) Defendant accuses plaintiff of advancing the erroneous contention that a carrier has an absolute duty to deliver freight cars in a reasonably safe condition. We do not understand plaintiff to so contend, although that theory may be inherent in plaintiff's contention that he was entitled to a directed verdict as a matter of law, a contention which we reject.

■ The duty of a railroad under the circumstances of this case is clearly set forth in Rylander v. Chicago Short Line Railway Company, 19 Ill.App.2d 29, 153 N.E.2d 225, affirmed by the Illinois Supreme Court, 17 Ill.2d 618, page 621, 161 N.E.2d 812, page 814, where the latter court stated:

> "The opinion of the Appellate Court analyzed the precedents which hold that a common carrier has a duty to deliver freight and tank cars that are in reasonably safe condition for the foreseeable uses of the recipient. The authorities need not be re-examined because the principle involved seems fundamental. We think that it applies here · even though the defendant did not own the car and Interlake, as its exclusive lessee, could direct whether and when it would be used again. The defendant regularly maintained car inspectors at the Interlake yard who were required to inspect all cars before they were turned over to Interlake. When defects were found by the inspectors they were either repaired by the defendant or the car was sent back to its owner. There is no indication that the car from which the plaintiff fell was ever inspected by the defendant. Interlake did not have car inspectors or repair facilities. From the evidence the jury could find that the defendant negligently failed to make a proper inspection of the car before returning it to Interlake. The possibility that Interlake might also have breached its duty, under a contract

or under commission regulations, when it directed that the car be spotted for reloading without inspection, does not absolve the defendant from its obligation to deliver the car in a safe condition."

■ Plaintiff relies heavily upon defendant's failure to inspect the car prior to its delivery to the Westgate Elevator for the shipment of grain. Defendant points out, "The car was under seal at all times while it was in defendant's possession, with the exception of the time it was unloaded in Sumner and loaded in Westgate, Iowa," and cites many cases in support of the proposition that a carrier is under no obligation to inspect the inside of a loaded car while it is under seal. The argument and the cases cited are beside the point because admittedly the car from the time it was unloaded at Sumner until it was loaded at Westgate (a period of four days) was an empty car. Defendant appears to suggest, without expressly so stating, that it was relieved of the duty to inspect because both Sumner and Westgate are small towns where it maintained no inspectors. In our view, the suggestion is not tenable. Defendant selected the car for use of the shipper and the law imposed a duty upon it to furnish one, as stated by the Illinois Supreme Court, "in reasonably safe condition for the foreseeable uses of the recipient." Its failure to inspect cannot be excused on the basis that it had no inspector available.

Defendant also argues that even though it failed to inspect the car prior to its delivery to the shipper, still it would not be liable absent proof that inspection, if made, would have disclosed the particular defect. In the cases cited, the courts were generally speaking of a latent defect not discoverable in the exercise of reasonable care. Typical of such cases is National Builders Bank v. Schuham, 319 Ill.App. 546, 49 N.E.2d 825. In that case, plaintiff's decedent was employed by defendant to paint window sashes on his building. He fell to his death when a rotted portion of the window sash which decedent was painting

gave way. The court, in affirming a judgment for the defendant, stated (page 553, 49 N.E.2d page 828):

"Under the facts of this case it must be held as a matter of law that the defendant was not guilty of negligence unless it was his duty in the exercise of reasonable care to take or saw apart the lower bar of the sash in question to discover whether it had rotted on the inside before he permitted decedent to paint or prepare to paint said sash. Defendant was under no such duty."

In the instant case, defendant's witness who inspected the car the day after the accident described the wooden door posts to which the paper door was attached as "broken out," "broken and loose," and stated that the "defects appeared old." Thus, the defects were patent and the jury had a right to indulge in the inescapable inference that they were discoverable if a proper inspection had been made. More than that, failure of inspection was not the only negligence with which defendant was charged. For instance, it was alleged that defendant carelessly and negligently maintained and used a certain boxcar so that as a direct and proximate result thereof, plaintiff sustained injuries. Thus, with or without inspection, we think there was a submissible issue as to whether the defendant used reasonable and ordinary care in furnishing a car free from a dangerous and defective condition.

In concluding that the case was properly submitted to the jury, we do not overlook defendant's contention that plaintiff was guilty of contributory negligence. The only point made in this respect is that plaintiff stood in front rather than at the side of the door while attempting to open it. It is pointed out that a defendant witness testified that men were instructed not to stand in front of a car door when opening it so as to avoid injury if it came off. These instructions, however, were given to railroad employees and there is no proof that plaintiff was so instructed. In our view, the proof as it relates to contributory negligence carries little, if any, weight. Certainly it was not sufficient to bar submission.

This brings us to a consideration, vigorously contested, that plaintiff was deprived of a fair and impartial trial because of prejudicial errors committed during the course of the trial. As a prelude to this discussion, it appears pertinent to summarize testimony as it relates to plaintiff's medical history and his physical condition both prior and subsequent to March 16, 1958, the date of the occurrence in controversy. In doing so, it would be difficult and we shall not attempt to separate that portion of the medical testimony relevant to the issue of liability from that relevant to damages.

Defendant brands plaintiff as a faker, attempting to recover for injuries which did not result from the occurrence in suit. While there is some basis for this argument, it is no answer to the contention that errors were committed which deprived plaintiff of a fair trial. The record is convincing that plaintiff received serious injuries which caused or contributed to his physical condition following the occurrence of March 16, 1958. Defendant in its brief states:

"We wish to make clear that we do not claim that plaintiff is a normal individual. Unless he fooled Dr. Boshes, which the latter admitted was possible, apparently he is suffering from a neurosis, which could have been triggered by almost anything, including the alleged accident."

Plaintiff was admitted to the Walther Memorial Hospital a few hours after the occurrence of March 16, 1958, and remained there for a week. Dr. Henry Falk (not a witness at the trial) recorded a "Personal History" of plaintiff, wherein he noted that the chief complaints were "headaches, nausea, vomiting" and that "the patient may be mentally confused or dull." He also noted that "the

swelling of the scalp has receded but the head in the left frontal-parietal area is still tender." Dr. Falk referred plaintiff to Dr. James J. Duffy, a neurosurgeon who diagnosed plaintiff's condition as being a cerebral concussion. He was of the opinion that the occurrence of March 16, 1958 was sufficient to cause plaintiff's condition of ill-being and expressed the opinion that the brain injury was permanent.

Dr. Alex J. Arieff, a specialist in neurology and psychology, first examined plaintiff in November 1959. He found nystagmus, i. e., movements of the eyeball which sometimes occur with brain injury. Dr. Arieff saw plaintiff in January 1960, and subsequently in conjunction with Dr. Benjamin Boshes, at the request of defendant. During this period plaintiff at first was excited, agitated and carried on an incoherent and irrelevant speech, but later his condition improved. Dr. Arieff continued to see plaintiff at regular intervals until May 29, 1961, just prior to the time plaintiff moved to Phoenix, Arizona. During these different visits, plaintiff usually was agitated and incoherent but had periods of lucidity. Dr. Arieff examined plaintiff a few days before the trial, found him difficult to recognize and that he had lost twenty pounds while in Arizona (in a period of about four months). He expressed the opinion that plaintiff had physical damage to his brain which was causing his mental and subjective complaints and that his condition was permanent. Dr. Joseph Wepman, a psychologist, gave plaintiff adult intelligence tests and found that he was functioning at the level of a 12-year old. He expressed the opinion that plaintiff had sustained brain damage.

Dr. Benjamin Boshes, a specialist in neurology and psychiatry, a witness for the defendant who examined plaintiff on November 4, 1959, expressed the opinion that plaintiff had suffered no organic brain damage but that he was an emotionally insecure and unstable person in his past life and that some experience, such as the occurrence here, had lifted the lid and uncovered all past insecurity. In response to a hypothetical question, he was of the opinion that the occurrence of March 16, 1958 "could be the uncovering factor in producing the picture that we saw in this man."

There was much controversy as to plaintiff's physical and mental condition prior to the time of the occurrence in issue. Plaintiff offered numerous witnesses to show that his condition was normal, including a physician who had known and treated him and members of his family during the period between 1947 and 1951, a number of neighbors and fellow employees, as well as his daughter and sister. Some of these witnesses also testified as to his poor mental and physical condition subsequent to the occurrence. On the other hand, defendant offered testimony asserted to show that plaintiff's poor physical and mental condition was of long standing and that his condition subsequent to the occurrence was not as bad as portrayed by his witnesses.

Plaintiff advances many reasons in support of his contention that he did not receive a fair and impartial trial. Inasmuch as we have reached the conclusion that the judgment must be reversed because of numerous prejudicial errors committed by the trial court, we shall only discuss those which we regard as the more important. In this connection, we note defendant's contention, "It is well settled that alleged erroneous rulings as to the admission of evidence or the giving of instructions are harmless when the complaining party, in no event, is entitled to recover." This contention, as well as the cases cited in support thereof, is inapplicable in view of our holding that the proof was such as to require a submission of the case to the jury.

■ The admission of the testimony that plaintiff was shot in the back by Thomas, a police officer, in 1944 (14 years prior to the occurrence in issue) in our view was clearly erroneous. It was offered by defendant and admitted by the court as relating to plaintiff's prior phys-

ical condition, notwithstanding the fact that the hospital record made in connection with the incident showed that plaintiff had completely recovered from that injury. Defendant in its brief states:

> "Ordinarily, the fact that plaintiff suffered some other physical injury years ago would be irrelevant. Here the question was the present mental and emotional condition of plaintiff and the cause and causes therefor."

The fallacy of this contention is that there is no proof of causal connection between the gunshot wound in 1944 and the car door incident of 1958. Defendant attempts to supply this missing link by the testimony of its witness, Dr. Boshes. In a hypothetical question incorporating many assumptions was included, "Assume further, Doctor, that he suffered a bullet wound in his chest in 1944 and was hospitalized for about a week therefor." (Plaintiff was shot in the back, not the chest.) In response to the hypothetical question, the witness stated, "There might or could be a causal connection." The answer, in our view, constituted no proof that plaintiff's wound in 1944 bore any relation to his condition in 1958, and subsequently. True, the court instructed the jury to disregard the fact that Thomas was a police officer. Indulging in the dubious assumption that the jury obeyed the admonition, the admission of the testimony was erroneous, whether the shooting was by a police officer or some other person.

Plaintiff contends that the court erroneously permitted introduction of proof that he had been convicted of a felony in 1944, for the purpose of impeachment. The contention rests on the premise that plaintiff had testified to no material fact, which is a prerequisite to the right to impeach by the introduction of a felony conviction. He was called as a witness in his own behalf, for what purpose we do not know, and testified only as follows:

> "Q. Would you tell us your name?
>
> "A. Willie Pellegrini.

> "Q. Where do you live, Willie?
>
> "A. 5044–31st Street, Melrose Park. I have a headache now. Noise.
>
> "Q. All right.
>
> "A. Where is Edie? Where is Edie? Where is my sister? I'm going to find Edie now. There's some noise out here."

While on the stand plaintiff indulged in certain activities characterized by counsel for defendant as indicating insanity. These activities are not shown in the record and we think would be of no aid if they were. The court apparently agreed with plaintiff's counsel that plaintiff had not testified to any material facts in the case but held the proof admissible on the theory that statements made by him to his doctors, during treatment long before the trial and testified to by the doctors, put plaintiff's credibility in issue, and that proof of his prior conviction was permissible as "impeaching the whole complaint." We think the court's theory was fallacious and we assume defendant's counsel thinks likewise because no effort is made here to defend it; in fact, it is not even mentioned. Defendant recognizes that impeachment in the manner under discussion is proper only where the witness has testified under oath to facts material to the issues in the case but makes the strained and untenable contention that plaintiff's testimony and his actions on the stand, characterized as "demonstrative" evidence, justify the admission of the impeaching testimony. No case is cited and we know of none which supports the admission of this testimony, either for the reason advanced by the court or the attempt made here to justify its admission. We hold that its admission was erroneous.

The error committed in the admission of proof of plaintiff's former conviction was compounded by the following instruction:

> "The Court instructs the jury that the plaintiff in this case was convicted of a felony in the State of Indiana, and that under the law the

conviction of a felony is evidence tending to impeach him and, in determining the weight you should attach to the evidence he gave, you have the right to take into consideration the fact that he was convicted of a felony in the State of Indiana."

■ Plaintiff contends that much of the evidence relating to his prior physical and mental condition was improperly admitted. In view of the conclusion which we have reached, we shall only discuss the admission of defendant's Exhibit 19. It appears that plaintiff instituted an action in the state court to recover for personal injuries sustained in an accident August 16, 1936. The exhibit purported to be a medical report made by Dr. E. A. Crown relative to plaintiff's physical and mental condition at that time. Attorney Feldman apparently represented plaintiff in that action and the exhibit was found in the office file of Attorney Levin (an associate of Feldman) and produced in court by Levin. The report, in handwritten form, was on the doctor's stationery and contained the correct name of the patient (plaintiff), his address and the fact that he sustained injuries while a passenger of the Chicago Motor Coach Company. The name of Dr. Crown appeared on the report in typed form. Dr. Crown, a defendant's witness, when interrogated concerning the report testified among other things that he had no recollection of having treated or examined a man named Willie Pellegrini during the period of 1936 to 1938, that he had searched his files and had no record concerning the same, that it was his custom to make some kind of a record in his own handwriting and that he presumed if the report was in his handwriting, it was correct. He further stated, after examining the report, that he had no recollection of the same and that he had no practice of incorporating his medical findings in a form such as Exhibit 19.

Defendant in support of the admissibility of this exhibit cites Korte v. New York, New Haven & H. R. Co., 2 Cir.,

191 F.2d 86, and White v. Zutell, 2 Cir., 263 F.2d 613. In those cases, there was no question as to the authenticity of the reports held admissible while in the instant case there is no such proof. Dr. Crown did not sign the report, could not say it was in his handwriting and, in fact, knew nothing about it. With this uncertain and negative foundation, we think the exhibit was erroneously admitted.

■ We now come to plaintiff's criticism of the instructions. Instruction S told the jury that it was plaintiff's duty to minimize his damages and that he could not recover any damages resulting from reasonably failing to undergo treatment. Cases are cited which support the view that the instruction states a valid principle of law. Plaintiff's objection to the instruction is that it is without evidentiary basis. We find no testimony that plaintiff refused or neglected to take or submit to any treatment recommended to him by a doctor. The instruction should not have been given.

■ Defendant's instruction V stated:

"The Court instructs the jury that, if you find from the evidence, that the sole proximate cause of the fall of the box car door in question was improper loading on the part of the shipper then you should find the defendants not guilty."

We think this instruction also should not have been given. There is no proof that the car was improperly loaded by the shipper, in fact, no proof as to the manner of its loading. Thus, the jury was left to speculate, without proof, that the shipper rather than defendant might have been responsible for the accident resulting in plaintiff's injuries. More than that, the shipper had a right to assume that the car furnished by defendant had been inspected by it and found reasonably safe. See Rylander v. Chicago Short Line Ry. Co., 19 Ill.App.2d 29, 44, 153 N.E.2d 225.

456

Much complaint is also made as to defendant's instruction M:

"The Court instructs the jury that the extent of the duty of the Chicago Great Western Railway Company toward the plaintiff was to exercise reasonable care in inspecting said car and the parts and appurtenances thereof, including the door and door posts, and if you find from the evidence that the Chicago Great Western Railway Company did in fact make a reasonably careful inspection of the car, and the parts and appurtenances thereon, including the door and door posts, then you should find the defendant Chicago Great Western Railway Company not guilty, even though you further find that plaintiff was injured because the railroad car door fell upon him because of a defect."

This instruction is vulnerable for numerous reasons. It tells the jury that if they find from the evidence that defendant made a reasonable, careful inspection of the car, including the door and door posts, defendant should be found not guilty even though the car door fell as the result of a defect. There is no proof that defendant made an inspection of the inside of the car; in fact, the evidence is that it made no such inspection and, as previously shown, its excuse was that it had no inspector at the points where the car might have been inspected. True, the failure to inspect was one of the acts of negligence alleged, but defendant was also charged with negligence in supplying a car which had a door and door posts which defendant knew, or ought to have known, were in a dangerous condition and unsafe to be worked upon by plaintiff and others doing similar work. Thus, inspection or no inspection, defendant was under a duty, as stated by the Illinois Supreme Court in Rylander, to furnish the shipper a car "in reasonably safe condition for the foreseeable uses of the recipient." We think the giving of this instruction was erroneous, both from a factual and legal standpoint. Certainly it was confusing and calculated to mislead the jury.

Of the many errors assigned, we think that the ones which we have discussed are such as to require a reversal of the judgment. It cannot be held that they were harmless and, therefore, non-prejudicial. Particularly is this so in view of our conclusion that the case on its facts was close.

The judgment is, therefore, reversed and the cause remanded for a new trial.

On Petition for Modification

Petition denied.

MAJOR and SWYGERT, JJ., concur.

DUFFY, Circuit Judge.

I would vote to grant in part, the petition of the defendant for modification of our opinion.

In my view, the record discloses a considerable amount of misrepresentation as to plaintiff's physical and mental condition at the time of the trial. For instance, seven hundred feet of motion picture film show plaintiff driving an automobile without any apparent difficulty; attending a world-series ball game; driving his children to school; cooking, serving and selling in a restaurant in Arizona; conversing with neighbors and engaged in various activities. Yet witnesses for the plaintiff testified that during the same period, plaintiff was in a constant state of mental confusion, and was unable to drive an automobile, etc.

I think defendant should have been entitled to place in evidence, proof of plaintiff's felony conviction, on the question of whether plaintiff's actions were genuine.

I do not agree that the receipt of Exhibit 19 into evidence was error. In my view there was a sufficient foundation therefor.