---

### COPELAND et al. v. CHICAGO, B. & Q. R. CO. et al.

(Circuit Court of Appeals, Eighth Circuit.  September 4, 1923.)

#### No. 6161.

1. **Railroads ⬨⟹275(4)—Care required as to handlers of freight in cars and equipment.**

  A carrier is not an insurer of the absolute safety of its freight cars and their equipment, but is held only to reasonable care to deliver cars to consignor for loading and consignee for unloading in reasonably safe condition for those who are to handle the freight in and out of them.

2. **Railroads ⬨⟹275(4)—Failure of connecting carriers to make inspection inside loaded and closed car held not negligence.**

  An iron plate, imbedded in the frame of a freight car above a post to which the sliding doors were fastened when closed, fell and injured one of the men who opened the doors to unload the car. Bolts extended down through the plate, but there were no nuts on their ends nor were any nuts found. The car was loaded at a distant point some two weeks before, and before it came into the possession of either defendant carrier, and presumably sealed, and the plate was inside the doors and could not be inspected when they were closed. *Held,* that defendants were not chargeable with negligence in failing to discover the absence of the bolts after the car came into their possession.

3. **Trial ⬨⟹142—Insufficiency of evidence to warrant submission to jury.**

  Where two conclusions are equally deducible from the proof, one as fully sustainable as the other, on one of which there may be liability, and on the other not, the plaintiff, who asserts liability, has not made his case by a preponderance of the evidence, and it may not be submitted to the jury.

In Error to the District Court of the United States for the District of Nebraska; Joseph W. Woodrough, Judge.

Action at law by Annie Copeland, administratrix of the estate of John Copeland, deceased, and others, against the Chicago, Burlington & Quincy Railroad Company and another. Judgment for defendants, and plaintiffs bring error. Affirmed.

Anan Raymond, of Omaha, Neb. (Francis A. Brogan, A. G. Ellick, F. H. Gaines, R. A. Van Orsdel, and F. S. Gaines, all of Omaha, Neb., on the brief), for plaintiffs in error.

Wymer Dressler, of Omaha, Neb. (Robert D. Neely and Paul S. Topping, both of Omaha, Neb., were with him on the brief), for defendant in error Chicago & N. W. Ry. Co.

J. W. Weingarten, of Omaha, Neb. (Byron Clark and Jesse L. Root, both of Omaha, Neb., on the brief), for defendant in error Chicago, B. & Q. R. Co.

---

⬨⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before LEWIS, Circuit Judge, and BOOTH and JOHNSON, District Judges.

LEWIS, Circuit Judge. This action was brought against Chicago, Burlington & Quincy Railroad Company and Chicago & Northwestern Railway Company to recover damages on account of injuries received by John Copeland at Omaha on October 4, 1917, while he and Charles Smith were attempting to open a sliding door on the side of a box car for the purpose of unloading a shipment of automobiles contained in it. While Copeland and Smith were pushing back one of the doors an iron plate in the frame above fell and struck Copeland on the head, and the negligence alleged was the failure of defendants to discover that the nuts on the downward ends of four bolts that passed through the frame and plate to hold the plate in place were off, and in not replacing the nuts on the bolts. It was charged in the complaint that the absence of the nuts was open and apparent to defendants. The car belonged to Chicago & Northwestern. It was stipulated that it was in the possession of the Erie Railroad prior to September 20, 1917, but for how long before that it was not stated; that on September 20th it was in the possession of the Pennsylvania Railroad at Indianapolis, and that road furnished it to the Cole Motor Company for loading with automobiles to be shipped to Omaha. When the car was loaded the Pennsylvania transported it to Chicago, and there delivered it to Chicago & Northwestern, which transported it to Omaha, where it arrived on October 2d and was turned over to the Chicago, St. Paul, Minneapolis & Omaha Railway Company, and that company placed it on the transfer track in the north yards at Omaha, from which it was taken by the Burlington on October 3d and set at a warehouse at 5:30 P. M. of that day for unloading. The car as set stood east and west, and the platform on which the automobiles were to be unloaded was on its south side. Smith testified that when he got to the warehouse about 7 o'clock on the morning of October 4th the doors of the car were closed. He made no statement as to whether there were then seals on the doors, nor whether he made any observations in that respect. The warehouse foreman testified that the warehouse record had this notation:

"10—3—5:30 119458 C&NW. 10—4—12 seal south door open. 2575535 NW."

In answer to a question as to what sort of a record he kept of incoming cars at the warehouse, he answered, "A car number, initials and the seals." He further said the notation in the record was in his handwriting, and that it meant there were no seals on the south side of the car, but he did not state the day or hour at which the information as to the seals disclosed by the notation was obtained. It would seem from the notation that this information was gained on October 4th and not on the 3d. He further said that he made the record when cars are set at the warehouse platform, and that this car was set at the platform at 5:30 P. M. on October 3d. Inasmuch as it was his duty, according to his testimony, to put in his record the car number, initials and seals, and to do so at the time the car was set, it would appear from the record he made of date October 3d that there was nothing to be noted

as to the seals, that they were then in place, and that the seal on the south door was removed after the car was set and prior to the time at which his notation was made on the next day. He explained the meaning of the phrase, "seal south door open" as signifying that there were no seals on that side, the south side. He further testified that the north doors were "apparently" sealed. There is no testimony as to when the seals on the south doors were removed nor by whom. After Smith saw the car at the platform about 7 o'clock in the morning he went to assist in unloading another car of automobiles, and came back to unload this car some time in the forenoon. He testified that he opened one of the doors and placed a gang-plank. He described how the doors could be opened and closed and made fast when they were closed. No other witness testified about the doors, their mechanism and the iron plate in the door frame overhead. They were made to slide back and forth on the outside of the car, running on a track at the top and bottom. When they were closed they came together, and each partly overlapped a post about 4x6 inches which stood on the inside of the closed doors and reached from the bottom to the top of the door frame, standing immediately under and in contact with the iron plate which was mortised into the frame above. His testimony indicates that the door which he first opened was held fast when closed by lugs in the floor and on the post; but there is confusion in his testimony as to how the other door was held to the post. He speaks of two latches, one at the top and one at the bottom of the post, by which that door could be hooked to and unhooked from it, and said that when he undertook to open the second door he unfastened the upper latch. But he also said that the second door was made fast to the post by bolts, and that it moved back and forth with the door. Again, when asked if the post was fastened to the door so that it is part of the door, he answered, "Only to lock the door." Again, he said, "There is a latch at the bottom of this post and a latch at the top. You unloosen those latches and open the second door;" then he added, "They don't exactly work like some of them work—they work a little different." Nor is it clear what purpose the iron plate was intended to serve. Smith said there was a kind of a knob on it right in the center of its flat side, not on its edge, but that the doors when closed did not touch the iron plate, it was inside of the closed doors and was touched only by the post. He could not, alone, move that door, whereupon he got a crowbar about 3½ feet long and an inch thick and put it under the bottom of the post, and in that way moved it and the post two or three inches. Copeland then came to help him, and he told Copeland he could not get the door open and could not see what was the matter with it, and did not know what was the matter with it. When the two of them put their weight against the edge of this door and pushed it and the post back the plate of iron under which the post immediately stood fell out and struck Copeland on the head, inflicting the injuries complained of. Smith testified that he later found the plate on the ground under the car, and on further investigation discovered that there were four bolts protruding downward in the door frame overhead, and that as constructed these bolts pass through the iron plate, but that there were no nuts on their lower

ends and he could not find any in the car or on the ground. The iron plate was about seven inches wide and ten inches long, and the bolts that pass through the plate must have been set in from its ends and sides. He said he thought the bolts were only long enough to put the nuts on when the plate was in place. The plate and bolts were all inside the car when the doors were closed, and of course could not be seen from the outside. There was no testimony whatever as to the general condition of the car as to repairs, nor as to the doors in any other respect than that already noted. There is nothing in the record indicating for how long a time the nuts had been off, or whether they had ever been on. The warehouse foreman further testified that the car door was open a little bit.

"Q. Just so you could see that it was open? A. Yes, sir."

But he did not say when it was in that condition, whether on October 3d or 4th, nor at what hour, nor whether that statement was on his observation or a deduction from his notation in the warehouse record of October 4th. We cannot find any testimony from which it could be reasonably found as a fact that the doors of the car had been opened or the seals on the doors had been broken between the time it was loaded at Indianapolis on September 20th and the forenoon of October 4th. No inspection of the car from the outside after it was loaded and sealed at Indianapolis would have shown or suggested that the defect complained of existed. There would have been nothing to indicate that the doors and the frame work around them were not in proper condition, nor that the doors could not be opened and closed easily and with safety. No inspection would have disclosed that the nuts were not on the bolts, short of going inside the loaded car, if that could have been done, and making the minutest examination, and perhaps not then without a removal of the post which stood immediately under and in contact with the plate.

The errors assigned are all directed to the action of the court in directing verdicts for both defendants on the case thus made by the plaintiff below.

[1, 2] A carrier is not an insurer of the absolute safety of its freight cars and their equipment. It is held only to reasonable care. It is bound to deliver to consignor for loading and consignee for unloading, cars in reasonably safe condition for those who are to handle the freight in and out of them. The cases state the principle in different ways. In Pennsylvania R. Co. v. Hummel, 167 Fed. 90, 91, 92 C. C. A. 541, 543, it is said that a carrier owes a duty "of reasonable care in providing cars whose doors could be safely operated." In Maher v. Railway Co. (C. C. A.) 278 Fed. 431, it is said:

"It was defendant's duty to deliver a car that was in a reasonably safe condition to be used for the purpose intended."

In Waldron v. Director General (C. C. A.) 266 Fed. 196, the principle is stated this way:

"A carrier * * * is liable for injuries to the shipper or his employé, due to a defect in the car which might have been discovered by reasonable care in inspection."

This court, in Railway Co. v. Senske, 201 Fed. 637, held that a defective condition in a hand-hold on the roof of a car which was not discoverable by an inspection made with ordinary care could not be the basis of recovery. The record does not show whether either defendant did inspect or did not inspect the car. After the car was loaded at Indianapolis, and the doors closed and fastened to the post which stood under and in contact with the plate that fell, we think the defect complained of was, as to connecting and delivering carriers, a latent and hidden one, that under the facts there was nothing that would call attention to or suggest that the nuts were off of the bolts, and that no reasonably careful inspection of the car would have discovered that they were off. To hold on the facts that the defendants were required to open and enter this loaded car while it was in their possession and take such steps as would have led to a discovery that the nuts were off of the bolts, would require of them not a reasonable but an unreasonable inspection, a minute and detailed examination, made upon a vague guess that an inside inspection might perchance, if carried far enough, develop something, hidden though it be and the existence of which there was no cause to suspect, that could be repaired. The facts adduced by plaintiff did not impose on defendants a duty to show they had done an aimless thing. The law places no such impracticable burden and requirements on the carrier. A case much like this, though stronger for the plaintiff on the facts, is Railway Co. v. Pysher (Tex. Civ. App.) 195 S. W. 981. The injury there complained of was on account of the falling of an iron plate in the door frame of the car from overhead. It further appeared in that case that the holes in the frame for the bolts were shattered and the wood looked rotten and inadequate to hold them. It was held that a failure to inspect the loaded car on the inside and discover the defect was not negligence. Furthermore, it appears here that the plate was mortised into the door frame overhead. There is nothing to indicate how long the nuts had been off the bolts. The probabilities are that the plate had remained and would remain in place for ordinary and proper use and that the immediate and proximate cause of its becoming loosened and made to fall was the wrenching of the post against it by Smith when he made use of the crowbar. Smith's acts were the interposition of an independent force, and if but for his acts the injury to Copeland would not have happened, then the negligence complained of was the remote, and the acts of Smith the proximate cause of the injury. See Davis v. Schroeder, 291 Fed. 47, opinion of this court filed June 18th last, and cases cited.

[3] Where two conclusions are equally deducible from the proof, one as fully sustainable as the other, on one of which there may be liability and on the other not, then the case may not be submitted to the jury. This is no more than stating in another form the legal requirement that the plaintiff shall make his case by a preponderance or greater weight of the evidence. We do not say that the proof sustains a conclusion that the iron plate fell because it was wrenched from its mortised bed when Smith pried the post with the crowbar—we think it does not; but on the proof it is as reasonable to say so as that it fell because the nuts were not on the bolts. The immediate and proximate

cause may have been either, one as well supported as the other. Patton v. Ry. Co., 179 U. S. 658, 663, 21 Sup. Ct. 275, 45 L. Ed. 361; Ill. Cent. R. Co. v. Coughlin, 132 Fel. 803, 65 C. C. A. 101. We agree with the trial court that the plaintiff did not make out a prima facie case.

Affirmed.

---

For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes