**Raymond H. HAILEY, II, Plaintiff-Respondent,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant-Appellant.**

No. 10112.

Missouri Court of Appeals,
Southern District,
En Banc.

March 9, 1979.

Appellant's Motion for Rehearing or for Transfer Denied March 29, 1979.

John R. Martin, A. L. Shortridge, Joplin, for plaintiff-respondent.

Laurence H. Flanigan, Carthage, Sam D. Parker, Joseph E. Stevens, Jr., R. B. Miller, III, Kansas City, for defendant-appellant.

TITUS, Judge.

Plaintiff was injured August 31, 1971, on the premises of his employer, Fleming Foods Company (Fleming), at Joplin, Missouri, when a 785 pound (approximately) load-divider door fell upon him as he started to unload the "B" end of defendant's railroad boxcar. A Jasper County jury awarded plaintiff damages and, following denial of its post-trial motions, defendant appealed. Neither the nature and extent of plaintiff's injuries nor the amount of the verdict ($36,250) is an issue on appeal.

The interior of defendant's boxcar could be divided into three compartments by use of two inside movable load-divider doors when they were placed upright and perpendicular to the sides of the car. At the center top of each door was attached an inverted "U" shaped bracket which fit inside a two-holed clevis device affixed to an overhead slide rail running across the width of the ceiling. The bracket and clevis were held together by a 9-inch bolt causing the divider door to be suspended upright across the width and height of the boxcar's interior. The bolt first went horizontally through one of the clevis holes, thence through the bracket and then through the second hole in the clevis before a castle nut was twisted onto the threaded end of the bolt. To prevent the castle nut from loosening via movements of the car in transit and otherwise, a cotter key or pin was inserted and thereafter supposedly spread through a hole near the threaded end of the bolt after the nut was in place. As further assurance of the divider door's stability after it was once in place, retractable pins were extended from the top and bottom of each corner of the divider by lowering a handle in the center front of the door. When the compartment behind the divider at each end of the car was to be unloaded and the divider door was to be moved to accommodate the process, the door handle was raised thus causing the corner pins to retract from their holes in the floor and ceiling of the boxcar leaving the connected bracket and clevis at the center top of the door as its sole support.

On July 27, 1971, the subject boxcar was received at defendant's yards in Kansas City, Kansas, for repairs. Between that date and August 3, 1971, unspecified repairs were made to either one or both of the two load-divider doors in the boxcar. An inspection and approval card signed by defendant's employee Madrigal and dated "8–3–71", was attached to a placard board on the side of the boxcar. Inter alia, it read: "OK Ld. Divider." However, Madrigal subsequently testified he had not, in fact, made an inspection of the interior of the car but had simply relied on what the regular inspector had told him.

Defendant delivered the boxcar on August 5, 1971, to the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (Milwaukee). At that time the car was empty, the interior load-divider doors were in place, and the outside doors were closed but unsealed. Milwaukee ostensibly delivered the boxcar to the Green Giant Company in Glencoe, Minnesota, where it was loaded and the outer doors sealed. The car was taken by Milwaukee to Kansas City, Missouri, where it was turned over to the Kansas City Southern Railroad Company (Southern) on August 25, 1971. Southern took the car to a siding at Fleming's in Joplin on August 27, 1971, where it remained with seals intact until the accident occurred.

Before plaintiff and fellow-employee Moore started unloading the car at Fleming's warehouse around 1 a. m. August 31, 1971, Moore broke the seals on the side doors. Without incident, plaintiff and Moore unloaded the center section of the boxcar, moved the load-divider door at the "A" end of the car and unloaded that area. As Moore was leaving the boxcar with freight, plaintiff raised the lever on the face of the load-divider door at the "B" end of the car. This retracted the pins at the corners of the door. However, the bracket and clevis at the top center of the door were not engaged and the door dropped to the floor falling towards the "A" end of the car against and onto plaintiff who was knocked to the floor. Moore and other Fleming employees partially raised the top end of the divider to permit plaintiff's extraction. The door was then lowered to its original fallen position.

Southern's agent at Joplin was notified of the event and arrived at the scene about 8 a. m. The "B" end of the car (the part behind the fallen divider) had been unloaded prior to the agent's arrival. The agent found the bolt which should have connected the bracket and clevis between the top of the fallen divider and the floor of the boxcar. The threaded end of the bolt had been "skinned." He found the castle nut on the

boxcar floor near the "A" divider. No cotter pin or any part of one was found. Subsequent searches of the boxcar that day and the day following by the agent, car inspector, claim agent and commercial photographer failed to produce a cotter pin. However, the agent acknowledged on cross-examination that he and the others in their searchings for a cotter pin, did not look under the fallen door, into each hole in the tracks along the interior sides of the boxcar floor, into the partially open-top boxes which constituted the freight in the car, on the warehouse decking or on the ground outside the open side door of the car. It was the agent's opinion, nevertheless, that if a cotter pin had been inserted in the bolt and had worked loose or broken, it would have fallen into the track on the top of the upright divider door and would have been thrown forward in the empty end of the car as the castle nut had done when the divider fell. The agent also observed that on each side of the outside of the boxcar were painted instructions to "close and lock [outside] door before moving car." Southern's agent testified that "for the benefit of crews" handling such a car, "you don't want to move that car until you close the door," whether the car is loaded or empty. Following post-accident inspections of the car, the agent "bad ordered" it and had the car billed back to defendant for repairs to the divider door. At that time the bolt, castle nut and the fallen divider door were inside the boxcar. Whether defendant subsequently did or did not find a cotter pin, broken or otherwise, inside the boxcar after its return, was not revealed.

In substance, defendant's first and third points relied on are that the trial court erred in overruling defendant's motion for directed verdict and its post-trial motion for judgment n. o. v. because evidence was lacking to show the railroad car was in a defective condition either when defendant surrendered possession or at the time it was delivered to the consignor. Also, defendant says there was an absence of proof that Southern and Milwaukee exercised due care to inspect the car and deliver it without defect. Defendant asserts this hiatus demonstrates that Southern and Milwaukee were interveningly negligent or, if not, that their inspection revealed no defect. In our review of the trial court's rulings on these motions, we must envision the evidence in the light most favorable to the plaintiff and give him the benefit of all reasonable inferences arising from such evidence. *Crain v. Webster Elec. Cooperative*, 568 S.W.2d 781, 787[6] (Mo.App.1978).

■ When viewed as above dictated, the evidence demonstrated that when defendant's empty boxcar left its possession August 5, 1971, it ostensibly had been subjected to repairs, among which were unspecified repairs to a load-divider door as attested by the attached inspection and approval card reading, "OK Ld. Divider." At that time the outside doors, though not sealed, were closed and each interior divider door was positioned upright and locked into place "at right angles with the sides of the car." Albeit the record does not show whether Milwaukee or Green Giant did or did not inspect the interior load-divider doors while the car was en route to or being loaded at Glencoe, Minnesota, it was reasonable for the jury to assume, contrary to defendant's suggestions as to possibilities otherwise, that nothing untoward proceeding thereto or then occurred or was reasonably evident with respect to the divider doors because the car was loaded and the divider doors were repositioned and secured in the usual fashion without reported incident. After the car was loaded and the outside doors were closed and sealed, the defect complained of as to subsequent carriers of the car, was hidden and latent. To require such carriers to break the seals and enter the loaded car and conduct detailed examination of the positioned load-divider door to ascertain whether or not the nuts were off the bolts supporting the dividers, would require of them not a reasonable, but an unreasonable and minute examination which they were not required to make and which defendant should have known would not be made. *Copeland v. Chicago, B. & Q. R. Co.*, 293 F. 12, 16[2] (8th Cir. 1923); *Butler v. Central of Georgia Ry. Co.*, 87

Ga.App. 492, 74 S.E.2d 395, 397[2] (1953); 65 Am.Jur.2d, Railroads, § 414, pp. 582–583.

■ Upon appeal, defendant urges the possibility of a myriad of putative situations couched in conjecturals which envision various hypothetical events that conceivably might have befouled the load-divider door (or the freight car itself) and caused its falling for reasons other than that defendant negligently failed to insert or properly insert a cotter key through the bolt supporting the load divider at the "B" end of the car. It begets interest to again note that shortly after the accident, the car was "bad ordered" back to defendant who presumably had unlimited time and talent to inspect the fallen load-divider door, its attachments and other parts of the freight car. If, from its inspections, defendant unearthed any facts or circumstances corroborative of any suppositions which could negative the evidence and inferences that a cotter key had been improperly inserted or lacking from the supportive bolt, such evidence was conspicuous only by reason of its total absence. In fact, the evidence was wholly barren as to what, if anything, defendant's investigation and inspection of the boxcar disclosed. The neglect or failure of a litigant having knowledge of facts vitally affecting issues on trial to summon witnesses within its power who have knowledge of such facts and circumstances, raises a strong presumption and warrants an inference, that the testimony of such witnesses would have been damaging and unfavorable. *Ehrle v. Bank Bldg. & Equip. Corp. of America*, 530 S.W.2d 482, 493[14] (Mo. App.1975); *State ex rel. St. Louis County Transit Company v. Walsh*, 327 S.W.2d 713, 717[5] (Mo.App.1959).

■ In determining liability in this case, the question is whether the jury could reasonably find that defendant, in the exercise of ordinary care, by initially putting into commerce a boxcar with a load-divider door whose supportive mechanism was improperly secured, either because of a missing or improperly inserted cotter key, could reasonably foresee a risk of injury to one thereafter using the door in performing loading or unloading duties. The test here is whether, because of the absence or improper insertion of such a cotter key, it could be foreseen that the car, in the ordinary course of events, would be transported and used in such fashion that its movements would eventually cause the castle nut to work loose from the bolt and permit the bolt to work free of the center holding device and thus permit the door to fall when the retractable corner pins were disengaged from their supportive positions. We conclude that the issues were for resolution by the jury and that plaintiff made a submissible case. Cf. *Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573, 580[4] (Mo. banc 1978).

Defendant's second point relied on: "The trial court erred in giving Instruction No. 2,[1] plaintiff's verdict directing instruction, because it fails to require a finding that the car in question was in a defective condition when the defendant surrendered control of it."

■■ Without recasting in toto defendant's complaints against Instruction Number 2 as contained in its post-trial motions (no remonstrance theretofore was voiced otherwise), it suffices to say that defendant made no objections to the instruction because it did not "require a finding that the car in question was in a defective condition when defendant surrendered control of it." Until defendant's brief on appeal was filed, no such objection to the instruction was made apropos of the charge. It is aphoristic that alleged errors relating to an instruction which differ from or are not included in specific objections made to and determined by the trial court, are not reviewable on appeal. Rules[2] 78.07 and 84.-13(a); *Belter v. Crouch Bros., Inc.*, 554

1. Admittedly, plaintiff's instruction was Missouri Approved Jury Instruction (MAI), 2d Ed., numbered 31.01 verbatim. Subsequent to trial herein, MAI 31.01 was withdrawn, revised and renumbered 25.06. MAI, 2d Ed., 1978 Pocket Part, p. 236.

2. Missouri Supreme Court Rules of Civil Procedure, V.A.M.R.

S.W.2d 562, 563[2, 3] (Mo.App.1977); *Robinson v. St. John's Medical Center, Joplin*, 508 S.W.2d 7, 11[8] (Mo.App.1974); *Levey v. Roosevelt Federal S. & L. Ass'n of St. Louis*, 504 S.W.2d 241, 249[13] (Mo.App. 1973); *Thomas v. Fitch*, 435 S.W.2d 703, 708[7] (Mo.App.1968).

Initially in addition to defendant Santa Fe, Southern and Milwaukee were also named as defendants in the suit. However, at the close of plaintiff's case he dismissed his claim against Southern and Milwaukee with prejudice. For its fourth and final point defendant declares: "The voluntary dismissal of . . . Milwaukee . . . with prejudice compels the directing of a verdict for defendant Santa Fe because such a dismissal amounts to a finding against plaintiff that he was contributorily negligent as a matter of law or in the alternative constitutes a judicial admission by plaintiff that he was contributorily negligent."

■■■ This point comes to us without citation of authority. The Missouri Supreme Court recently rejected "an interpretation of Rule 84.04(d) which states categorically that appellate courts will not give further consideration to points which are not followed by citation of authority." *Thummel v. King*, 570 S.W.2d 679, 687[12, 13] (Mo. banc 1978). But rather than undertake an analysis of *Thummel* to ascertain whether defendant's fourth point, without citation of authority, requires consideration upon assumed merits, we fail to fathom in what respect defendant asseverates the dismissal amounts to a finding that plaintiff was contributorily negligent as a matter of law or that his dismissal as to Milwaukee was a judicial admission that he was contributorily negligent. Defendant's point relied on should be self-sufficiently written so that it is unnecessary for us to resort to other portions of the brief to come by "wherein and why" plaintiff was allegedly contributorily negligent or so admitted such averred fact. Without inspecting all parts of defendant's brief, a chore we are not obligated to perform (as yet), "wherein and why" its point warrants investigation is a matter of supposition which is not mandatory for us to explore. Rule 84.04(d); *Haase v. Richmond*, 570 S.W.2d 341, 343–344[1–4] (Mo.App.1978); *Simpson v. Island View Sales Corp.*, 540 S.W.2d 624, 625–626[1–3] (Mo.App.1976). However, all the foregoing be what it may, Rule 67.03 means that "dismissal with prejudice serves as a mechanism for the termination of litigation rather than adjudication of the issues therein involved." *Denny v. Mathieu*, 452 S.W.2d 114, 118[3] (Mo. banc 1970).[3] Plaintiff's dismissal as to Milwaukee with prejudice did not operate as an adjudication on the merits to prevent him from proceeding with the case against defendant because it was not equivalent to a jury verdict in favor of Milwaukee.

Judgment affirmed.

All concur except FLANIGAN, C. J., not participating.

---

**3.** Effective in September 1, 1973, and prior to trial of this cause, the second sentence of Rule 67.03 was revised to conform to the ruling in *Denny v. Mathieu*, 452 S.W.2d 114, 119[4] (Mo. banc 1970). The revised sentence reads: "A dismissal with prejudice bars the assertion of the same cause of action or claim against the same party." Committee Note—1974 to Rule 67.03.