Jeremiah **CROCKETT, et al., Plaintiff,**

v.

**UNIROYAL, INC., et al., Defendants.**

**Erma CROCKETT, Plaintiff,**

v.

**UNIROYAL, INC., et al., Defendants.**

Civ. A. No. 83–313–1–MAC, 83–314–2–MAC.

United States District Court,
M.D. Georgia,
Macon Division.

July 19, 1984.

William J. McKenney, Atlanta, Ga., for plaintiff.

Wallace Miller, III, Macon, Ga., Joyce B. Klemmer, Atlanta, Ga., F. Kennedy Hall, Macon, Ga., Arthur H. Glaser, Atlanta, Ga., J. Harvey Davis, Ocilla, Ga., for defendants.

**822**

## ORDER

OWENS, Chief Judge.

These actions, consolidated for purposes of pretrial proceedings and trial, involve a wrongful death and personal injury claim against Uniroyal, Inc. (Uniroyal), Southern Railway Company (Southern), and Seaboard System Railroad, Inc. (Seaboard). Plaintiffs' claim against Southern has been dismissed by prior order of this court. Southern remains as a party by virtue of defendant Uniroyal's cross-claim for indemnity or contribution. Uniroyal has also cross-claimed against Seaboard for indemnity or contribution. Presently before this court are motions for summary judgment by Seaboard on plaintiffs' claim and by both Southern and Seaboard on Uniroyal's cross-claim.

### Findings of Undisputed Fact

1. Defendant Uniroyal operates Alpine Laboratories in Bay Minette, Alabama.[1] A chemical known as substituted nitrophenol pesticide liquid is manufactured at Alpine Laboratories. This chemical is shipped to another Uniroyal plant, located in Gastonia, North Carolina, where it is used to produce an agricultural herbicide.

2. Defendant Uniroyal leased at least eight railroad tank cars from General American Transportation Company (GATX) to use to ship substituted nitrophenol pesticide liquid from Bay Minette, Alabama to Gastonia, North Carolina.

3. In early 1982, Uniroyal shipped four GATX tank cars (GATX car numbers 63506, 63457, 37819, and 75680) of substituted nitrophenol pesticide liquid from Bay Minette to Gastonia. At all times relevant to this litigation the words "SUBSTITUTED NITROPHENOL PESTICIDE LIQ-

UID" were stenciled in white letters on each of these four cars.

4. Employees of Uniroyal unloaded the cars in Gastonia, placarded each car as "EMPTY," and securely bolted each manway shut with eight bolts and two safety bolts. The cars were returned to Bay Minette.

5. Upon receipt of the rail cars in Bay Minette, an employee of Uniroyal determined that the interior tank of each rail car required cleaning. An agreement was reached between Uniroyal and Rail Car Services, Inc., located in Gordon, Georgia, for Rail Car Services to clean the four rail cars at its site in Gordon.[2]

6. Uniroyal instructed defendant Seaboard to transport said railroad cars from Bay Minette to Gordon. Seaboard moved the cars on its tracks to Atlanta and there delivered them to defendant Southern to move to Gordon on Southern's tracks for delivery to Rail Car Services.

7. Two of the cars—GATX 37819 and 75680—were delivered by Southern to Rail Car Services in the spring of 1982 and cleaned without incident in mid-July.

8. The remaining cars—GATX 63506 and 63457—were shipped from Bay Minette in June of 1982. Car number 63457 contained a residue[3] of substituted nitrophenol pesticide liquid, a "hazardous material," as defined at 40 C.F.R. § 261 Appendix VIII (1983).

9. Neither Uniroyal, Seaboard, nor Southern prepared or demanded a "hazardous waste manifest" (a shipping document described at 40 C.F.R. § 262 (1983)) for the shipment of GATX 63457.

---

**1.** At the time of the incident in question Alpine Laboratories was a wholly-owned subsidiary of Uniroyal, Inc. This court has previously determined that Uniroyal, Inc. is responsible for the acts of Alpine Laboratories relative to this suit.

**2.** The details discussed in this communication—particularly the nature of the substance last contained in GATX 63457—are the subject of a highly debated factual dispute between plaintiffs and Uniroyal. Resolution of this dispute,

however, is unnecessary for purposes of the motions considered herein.

**3.** Whether this residue was too extensive to render GATX 63457 "empty" under EPA and DOT regulations is a disputed question of fact. This dispute, however, does not affect the court's ability to rule on the question of law dispositive of the motions considered herein.

10. A waybill is a written document made out by the carrier listing point of origin and destination, consignor and consignee, and describing goods included in a shipment. It is delivered to connecting carriers for the purpose of instructing each railroad as to route and destination of each car. It is industry custom and practice not to give the consignee a copy of the waybill. Rail Car Services as consignee was therefore not given a copy of any of the waybills for these cars.

11. Seaboard prepared a waybill for GATX 63457, which stated that the car was empty, that it last contained substituted nitrophenol pesticide liquid, that it was being shipped to Rail Car Services for cleaning, and that the car was placarded "poison."[4] Unlike the waybills prepared for the prior shipment of cars 37819 and 75680, the waybill for car 63457 was not stamped "DANGEROUS."

12. Seaboard never physically inspected the interior of tank car 63457.

13. Southern received car 63457 from Seaboard, moved it on its tracks, and delivered it to Rail Car Services in Gordon on July 30, 1982. Southern never physically inspected the interior of car 63457.

14. On August 2, 1982, Shedrick and Jeremiah Crockett, brothers and fellow employees of Rail Car Services, entered the interior of car 63457 in order to clean it. While using steam to clean it both men became ill. Shedrick was taken to a hospital and died shortly after his admission.

*Issues Presented for Summary Judgment*

Plaintiffs' complaint alleges that the Crocketts and Rail Car Services were told by Uniroyal that GATX 63457 last contained a nontoxic food preservative. Liability of both railroads is predicated on a claim that each railroad owed a duty to warn of the presence of a toxic residue and its potential for harm.

*Plaintiff's Claim Against Seaboard*

Plaintiffs claim that Seaboard was negligent *per se* by failing to provide a "hazardous waste manifest" pursuant to DOT and EPA regulations. Alternatively, plaintiffs claim that Seaboard, having knowledge of the former contents of GATX 63457, had a common law duty to warn Rail Car Services of the potential harm. Seaboard responds by arguing, *inter alia*, that the regulations cited by plaintiffs do not require a hazardous waste manifest for an empty car, nor do they impose a duty upon a transporter to verify the consignor's claim that the car is indeed empty. Finally, Seaboard argues that plaintiffs have failed to allege a breach of the common law duty owed by a carrier to the consignee of a rail car not owned by the carrier.

*Uniroyal's Cross-Claim Against Seaboard*

Uniroyal argues that Seaboard's alleged prior "courtesy" in interpreting the applicable DOT and EPA regulations and in preparing all necessary shipping documents on Uniroyal's behalf renders Seaboard liable to Uniroyal, either in contribution or complete indemnity, should Uniroyal be held liable to plaintiffs for failing to provide a hazardous waste manifest. Seaboard responds with the same argument asserted against plaintiffs' claims, *i.e.*, that Seaboard was entitled to rely on Uniroyal's assurances that the cars were empty and contained no wastes, and that it had no duty to inspect and verify these representations.

*Uniroyal's Cross-Claim Against Southern*

Uniroyal's cross-claim against Southern for indemnity or contribution is similar to its claim against Seaboard, *i.e.*, Southern, as a carrier, should have refused transportation absent a hazardous waste manifest or other shipping document setting forth an adequate warning. Additionally, Uniroyal argues that Southern possessed peculiar knowledge as to Rail Car Services' commercial practices and inexperience in

---

**4.** The word "poison" did not appear in roman letters on the placards. Instead, the numeral "6" was shown, which the parties maintain is a United Nations code number for poison.

working with toxic chemicals. This "superior" knowledge, Uniroyal argues, created a duty upon Southern to inspect and warn Rail Car Services of the potential hazard. Southern, like Seaboard, maintains that it had no duty to verify Uniroyal's representation that GATX 63457 was empty and contained no hazardous wastes.

The issue of whether either railroad, given the undisputed findings of fact set forth above, had a duty to inspect GATX 63457 and warn of its dangerous propensities is dispositive of each pending motion for summary judgment. Plaintiffs and Uniroyal assert three bases for the existence of this duty: (1) the common law; (2) EPA and DOT regulations (negligence *per se*); and (3) with respect to defendant Southern, a claim of "superior" knowledge establishing a heightened duty of care.

### Conclusions of Law
#### Common Law Duty

■ Neither Seaboard nor Southern owned GATX 63457, and thus neither had a duty to inspect its interior. Each railroad provided only a service of transporting consignor Uniroyal's rail car to consignee Rail Car Services. Under Georgia law, "[t]here is no obligation upon a carrier to notify the consignee of the contents of his shipment.... The consignee may be presumed to know the contents of his shipment and expected to govern himself accordingly." *Davis v. Gossett & Sons*, 30 Ga.App. 576, 583–84, 118 S.E. 773, 777 (1923). The policy underlying this rule of law is explained in *Butler v. Central of Georgia Ry. Co.*, 87 Ga.App. 492, 74 S.E.2d 395 (1953). In *Butler*, a shipment of paper rolls weighing at least 1,000 pounds each·was shipped from North Carolina to the International Paper Company in East Point, Georgia. The shipment was initiated on Norfolk & Southern and concluded with Central of Georgia. Upon the arrival of the freight cars the plaintiff, an employee of International Paper, opened the freight door to begin unloading. A wooden frame designed to secure the paper rolls in place had deteriorated; the rolls broke loose and fell upon the plaintiff. He sued Central of Georgia, claiming that the railroad owed him a duty to inspect the interior of the car and either repair the defect or warn of its danger. The Georgia court explained the railroad's duty as follows:

The question for decision is whether the defendant, under the allegations of the petition, was negligent in not discovering and remedying or informing the consignee or its employees of the dangerous condition of the contents of the freight car. The answer to such question requires an examination of the duty owed by an ultimate or receiving carrier to inspect the contents of a loaded freight car before it is delivered to the consignee.

The ultimate carrier is under the duty to inspect a railroad car it receives in shipment to ascertain whether the car and its unloading devices are reasonably safe; and if, on examination, it is discovered that the car or any part of its unloading devices is unsafe, it is the carrier's duty to make the necessary repairs or correct the unsafe condition or to notify the consignee of the dangerous defects or condition. *Roy v. Georgia R. & Bkg. Co.*, 17 Ga.App. 34(2b) (86 S.E. 328). This duty to inspect applies only to an inspection for defects which an outside inspection of the loaded car would reveal. It is not the duty of the ultimate carrier to enter a loaded, closed car· to inspect the cargo and its anchoring devices to ascertain whether it is safe for unloading unless in the exercise of ordinary care an internal defect or unsafe condition could have been discovered in the course of the external inspection. *See Copeland v. Chicago B. & Q. Ry. Co.*, 293 Fed. 12; *Tucker v. Norfolk & Western Ry. Co.*, 194 N.C. 496 (140 S.E. 77). In the instant case a duty on the part of the defendant to inspect the condition of the cargo and its anchoring devices inside the car would have arisen only if in the exercise of ordinary care the external inspection would have revealed some defect or indication (such as a bulging door) which would have been sufficient to give notice

of a defect inside the car. To hold otherwise would require the ultimate carrier to break the seal and inspect the condition of the load in every car it receives regardless of what a reasonable inspection of the outside of the car reveals. This would be requiring an unreasonable if not a prohibitive inspection. There is no allegation here that there was any defect or indication on the car which should have been discovered during the inspection of the outside of the car and which would have required the inspection of the contents of the car and its anchoring device.[5]

*Id.* at 494–95, 74 S.E.2d at 397. Georgia law thus did not impose upon Southern or Seaboard a duty to verify Uniroyal's representation that GATX 63457 was empty. Plaintiffs' and Uniroyal's claim on this ground must fail.

### The EPA and DOT Regulations

The applicable federal regulations which plaintiffs and Uniroyal argue created a duty to inspect and warn are as follows:

### EPA Regulations

§ 262.11  Hazardous waste determination.

A person who generates a solid waste, as defined in 40 CFR 261.2, must determine if that waste is a hazardous waste....

### Subpart B—The Manifest

§ 262.20  General requirements.

(a) A generator who transports, or offers for transportation, hazardous waste for off-site treatment, storage, or disposal must prepare a manifest before transporting the waste off-site.

(b) A generator must designate on the manifest one facility which is permitted to handle the waste described on the manifest.

(c) A generator may also designate on the manifest one alternate facility which is permitted to handle his waste in the event an emergency prevents delivery of the waste to the primary designated facility.

(d) If the transporter is unable to deliver the hazardous waste to the designated facility or the alternate facility, the generator must either designate another facility or instruct the transporter to return the waste.

§ 262.21  Required information.

(a) The manifest must contain all of the following information:

(1) A manifest document number;

(2) The generator's name, mailing address, telephone number, and EPA identification number;

(3) The name and EPA identification number of each transporter;

(4) The name, address and EPA identification number of the designated facility and an alternate facility, if any;

(5) The description of the waste(s) (e.g., proper shipping name, etc.) required by regulations of the U.S. Department of Transportation in 49 CFR 172.-101, 172.202, and 172.203;

(6) The total quantity of each hazardous waste by units of weight or volume, and the type and number of containers as loaded into or onto the transport vehicle.

(b) The following certification must appear on the manifest: 'This is to certify that the above named materials are properly classified, described, packaged, marked, and labeled and are in proper condition for transportation according to the applicable regulations of the Department of Transportation and the EPA.'

§ 262.22  Number of copies.

The manifest consists of at least the number of copies which will provide the generator, each transporter, and the owner or operator of the designated facility with one copy each for their records and another copy to be returned to the generator.

§ 262.23  Use of the manifest.

(a) The generator must:

(1) Sign the manifest certification by hand; and

---

**5.** Although the opinion in *Butler* concerned a loaded freight car, the court perceives no distinction where a carrier receives for shipment a car, owned and maintained by another, placarded as empty and securely bolted shut.

(2) Obtain the handwritten signature of the initial transporter and date of acceptance on the manifest; and

(3) Retain one copy, in accordance with § 262.40(a).

(b) The generator must give the transporter the remaining copies of the manifest.

\*     \*     \*     \*     \*     \*

(d) For rail shipments of hazardous waste within the United States which originate at the site of generation, the generator must send at least three copies of the manifest dated and signed in accordance with this section to:

(i) The next non-rail transporter, if any; or

(ii) The designated facility if transported solely by rail; or

(iii) The last rail transporter to handle the waste in the United States if exported by rail.

§ 262.33   Placarding.

Before transporting hazardous waste or offering hazardous waste for transportation off-site, a generator must placard or offer the initial transporter the appropriate placards according to Department of Transportation regulations for hazardous materials under 49 CFR Part 172, Subpart F.

§ 263.10   Scope.

(a) These regulations establish standards which apply to persons transporting hazardous waste within the United States if the transportation requires a manifest under 40 CFR Part 262.

§ 263.20   The manifest system.

(a) A transporter may not accept hazardous waste from a generator unless it is accompanied by a manifest, signed by the generator in accordance with the provisions of 40 CFR Part 262.

(b) Before transporting the hazardous waste, the transporter must sign and date the manifest acknowledging acceptance of the hazardous waste from the generator. The transporter must return a signed copy to the generator before leaving the generator's property.

\*     \*     \*     \*     \*     \*

(f) For shipments involving rail transportation, the requirements of paragraphs (c), (d) and (e) do not apply and the following requirements do apply:

(1) When accepting hazardous waste from a non-rail transporter, the initial rail transporter must;

(i) Sign and date the manifest acknowledging acceptance of the hazardous waste;

(ii) Return a signed copy of the manifest to the non-rail transporter;

(iii) Forward at least three copies of the manifest to:

(A) The next non-rail transporter, if any; or,

(B) The designated facility, if the shipment is delivered to that facility by rail; or

(C) The last rail transporter designated to handle the waste in the United States;

(iv) Retain one copy of the manifest and rail shipping paper in accordance with § 263.22.

(2) Rail transporters must ensure that a shipping paper containing all the information required on the manifest (excluding the EPA identification numbers, generator certification, and signatures) accompanies the hazardous waste at all times.

NOTE: Intermediate rail transporters are not required to sign either the manifest or shipping paper.

(3) When delivering hazardous waste to the designated facility, a rail transporter must;

(i) Obtain the date of delivery and handwritten signature of the owner or operator of the designated facility on the manifest or the shipping paper (if the manifest has not been received by the facility; and

(ii) Retain a copy of the manifest or signed shipping paper in accordance with § 263.22.

(4) When delivering hazardous waste to a non-rail transporter a rail transporter must;

(i) Obtain the date of delivery and the handwritten signature of the next non-rail transporter on the manifest; and

(ii) Retain a copy of the manifest in accordance with § 263.22.

(5) Before accepting hazardous waste from a rail transporter, a non-rail transporter must sign and date the manifest and provide a copy to the rail transporter

(g) Transporters who transport hazardous waste out of the United States must:

(1) Indicate on the manifest the date the hazardous waste left the United States; and

(2) Sign the manifest and retain one copy in accordance with § 263.22(c); and

(3) Return a signed copy of the manifest to the generator.

## § 261.7 Residues of hazardous waste in empty containers.

(a)(1) Any hazardous waste remaining in either (i) an empty container or (ii) an inner liner removed from an empty container, as defined in paragraph (b) of this section, is not subject to regulation under Parts 261 through 265, or Part 270 or 124 of this chapter or to the notification requirements of Section 3010 of RCRA.

(b)(1) A container or an inner liner removed from a container that has held any hazardous waste, except a waste that is a compressed gas or that is identified in 261.-33(c) of this chapter, is empty if:

(i) All wastes have been removed that can be removed using the practices commonly employed to remove materials from that type of container, e.g., pouring, pumping, and aspirating, and

(ii) No more than 2.5 centimeters (one inch) of residue remain on the bottom of the container or inner liner, or

(iii)(A) No more than 3 percent by weight of the total capacity of the container remains in the container or inner liner if the container is less than or equal to 110 gallons in size, or

(B) No more than 0.3 percent by weight of the total capacity of the container remains in the container or inner liner if the container is greater than 110 gallons in size.

40 C.F.R. §§ 261–263 (1983).

*DOT Regulations*

172.205 Hazardous waste manifest.

(a) No person may offer, transport, transfer, or deliver a hazardous waste (waste) unless a hazardous waste manifest (manifest) is prepared, signed, carried, and given as required of that person by this section.

(b) The shipper (generator) shall prepare the manifest in accordance with 40 CFR Part 262.

(c) The original copy of the manifest must be dated by, and bear the handwritten signature of, the person representing—

(1) The shipper (generator) of the waste at the time it is offered for transportation, and

(2) The initial carrier accepting the waste for transportation.

(d) A copy of the manifest must be dated by, and bear the handwritten signature of the person representing—

(1) Each subsequent carrier accepting the waste for transportation, at the time of acceptance, and

(2) The designated facility receiving the waste, upon receipt.

(e) A copy of the manifest bearing all required dates and signatures must be—

(1) Given to a person representing each carrier accepting the waste for transportation,

(2) Carried during transportation in the same manner as required by this subchapter for shipping papers,

(3) Given to a person representing the designated facility receiving the waste.

## § 174.9 Inspection of tank cars.

(a) Each loaded placarded tank car must be inspected by the carrier before acceptance at the originating point and when received in interchange to see that it is not leaking and that the air and hand brakes, journal boxes, and trucks are in proper condition for service.

(b) An empty tank car which previously contained a hazardous material and which is tendered for movement or received in interchange must have all manhole covers, outlet valve reducers, outlet valve caps, outlet valve cap plugs, end plugs, and plugs or caps or other openings securely in their proper places, except that heater coil inlet and outlet pipes must be left open for drainage.

49 C.F.R. §§ 172, 174 (1983).

If a rail car qualifies as "empty" under 40 C.F.R. § 261.7 (1983), a hazardous waste manifest is not required. *Id.* at § 261.-7(a)(1). The obligation to determine if a hazardous waste is present, or if a tank car is empty, is placed on the generator. *Id.* at § 262.11. The regulations do not impose upon a transporter a duty to determine if a hazardous waste is present when the generator states it is not.

■ Whether GATX 63457 was actually empty is a question that need not be decided here.[6] The issue is whether defendants Seaboard or Southern, having been advised by the generator—Uniroyal—that the tank car was empty but had contained a hazardous waste, complied with EPA and DOT regulations in transporting the tank car without a hazardous waste manifest. Given what the railroads were told about GATX 63457, in conjunction with the lack of any regulatory duty to verify same, it is clear that from the railroads' perspective no manifest was required. Consequently, the EPA and DOT regulations imposed no duty upon either railroad to prepare or cause a hazardous waste manifest to be prepared.

*Southern's "Superior" Knowledge*

Whether Southern indeed possessed peculiar knowledge of Rail Car Services' alleged inexperience in working with toxic substances is the subject of a factual dispute not material to this motion and which this court therefore does not here decide. For purposes of Southern's motion for summary judgment, the court will assume that Uniroyal could prove its contentions.

Uniroyal cites the case of *Bradley Center, Inc. v. Wessner*, 250 Ga. 199, 296 S.E.2d 693 (1982), in support of its claim that Southern's peculiar knowledge created a duty to inspect and warn of the potential harm. In *Wessner*, the Supreme Court of Georgia, following the seminal case of *Tarasoff v. Regents of Univ. of Calif.*, 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976), held:

"where the course of treatment of a mental patient involves an exercise of 'control' over him by a physician who knows or should know that the patient is likely to cause bodily harm to others, an independent duty arises from that relationship and falls upon the physician to exercise that control with such reasonable care as to prevent harm to others at the hands of the patient."

*Wessner*, 250 Ga. at 201, 296 S.E.2d at 695–96. This "independent" duty exists despite the absence of a contractual relationship between the physician and the injured third party. *Id.* at 201, 296 S.E.2d at 695.

■ Uniroyal argues that the circumstances which created a duty to warn in *Wessner* are present by analogy here. This court must disagree. It is assumed for purposes of this motion that Southern actually knew that substituted nitrophenol pesticide liquid was toxic and that Rail Car Services generally cleaned rail cars which previously contained nontoxic substances. The factor which subjected the hospital in *Wessner* to liability was the hospital's *control* over the dangerous patient. Here, Southern did not have similar control over GATX 63457. Southern did not own GATX 63457. Unlike the hospital in *Wessner*, Southern did not receive GATX 63457 in order to inspect for and treat potential hazards. Southern's sole function was to deliver the car to Rail Car Services. It was told that the car was empty, and was justified in accepting this representation from

---

6. The court at this time makes no ruling regarding the admissibility of the regulations at trial, or upon the possible application of "negligence *per se*" in plaintiffs' action against Uniroyal.

Resolution of this issue must await additional argument concerning the purposes and intended beneficiaries of the federal regulatory scheme.

Uniroyal—the party who did possess ultimate control. Southern cannot be charged with knowledge of an unreasonable risk of harm and liability under the rule announced in *Wessner* cannot exist.

### Conclusion

Having determined that plaintiffs and Uniroyal have failed to allege a breach of duty by defendants Seaboard or Southern which would entitle them to prevail upon any of their respective claims, it is hereby ORDERED, ADJUDGED, and DECREED that summary judgment be entered in favor of Seaboard System Railroad, Inc. and Southern Railway Company and against plaintiffs Jeremiah and Emma Crockett, as well as against defendant Uniroyal, Inc. on its respective cross-claims.